**In re Jose Natalio GAMBOA, Debtor.**

**ASCI Readi–Mix and Asphalt Specialties, Co., Inc., Plaintiffs,**

**v.**

**Jose Natalio Gamboa, Defendant.**

**Bankruptcy No. 07–23984 EEB.**
**Adversary No. 08–01215 EEB.**

United States Bankruptcy Court, D. Colorado.

Dec. 16, 2008.

Frank L. DiSante, Littleton, CO, for Debtor.

## ORDER

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER, comes before the Court on the Plaintiffs' Complaint, objecting to the dischargeability of their debts under 11 U.S.C. § 523(a)(4) due to an alleged violation of Colorado's construction trust fund statute, Colo.Rev.Stat. § 38–22–127. Following trial, the Court hereby FINDS and CONCLUDES:

### I. Background

From 2000 to 2008, XC Construction, LLC ("XC") was engaged in the business of providing concrete foundations, casons, and footings in residential construction projects. The Debtor and his brother owned the business. The Debtor, as XC's President, supervised the office, including its accounting functions. His brother supervised the field work. The company entered into contracts to provide its services to builders at a fixed amount. As costs began to escalate, and XC could not pass through the increased charges, it experienced significant cash flow problems.

Plaintiffs supplied XC with $10 to $12 million worth of ready mix pancrete that XC used at numerous job sites over a period of about five to six years. According to the Debtor, XC was always behind in paying Plaintiffs, but it had been "whittling down" the balance. The parties agree that by the year 2007, XC's account with Plaintiffs was in arrears in excess of $1 million.

During this same time period, XC was in arrears with many of its suppliers. Build-

ers began withholding payments or issuing two-party checks. Some suppliers filed liens. XC made payments based on whichever supplier was pounding on the door the loudest. Finally, XC ceased doing business in 2008.

XC maintained one checking account for all of its business. While both the Debtor and his brother had signatory rights, it was the Debtor who signed the checks and made the deposits. Despite the fact that it had only one bank account, XC had accounting software to help it keep track of its receipts and disbursements on a project-by-project basis. The software, however, proved to be inadequate to the task. In addition, invoices from suppliers, including those received from the Plaintiffs, often did not reference the job site addresses. Complicating matters worse, XC often poured concrete at several different job sites within the same development on the same day, but the delivery ticket for the concrete would only list the initial address. Plaintiffs often credited XC's payments to the oldest invoice, rather than the invoice that represented a particular concrete purchase, for which XC had received payment from its builder and in turn issued a check to Plaintiffs. As a result, neither XC's nor the Plaintiffs' records could adequately track the builders' payments to XC and XC's payments to Plaintiffs, and match these payments to the Plaintiffs' paid and unpaid invoices.

In addition, from January through July, 2007, two builders issued at least eighteen checks that were made payable jointly to XC and Plaintiffs. The Debtor endorsed and deposited eighteen joint checks into XC's bank account, without first obtaining the Plaintiffs' endorsement or actual consent. He deposited six of the checks, without a second signature. On the other twelve checks, he signed the name of a salesman that had been employed by the Plaintiffs. Early in their relationship, these two parties had had some sort of written joint check agreement. Based on this prior agreement and past practices, the Debtor believed that he was authorized to negotiate these checks without Plaintiffs' involvement. Plaintiffs' representative, however, denied any authorization given to the XC or the Debtor and testified that the salesman, whose name the Debtor had endorsed on 12 checks, was no longer working for the Plaintiffs during the relevant time period.

No evidence suggested that the Debtor took builder funds intended for payment of suppliers and used them personally. In fact, as the business began to seriously falter, the Debtor and his brother obtained substantial personal loans from family and other sources that they put into the business. They paid the Plaintiffs directly on one $20,000 advance they received from their sister. Unfortunately, their personal contributions were not able to save the business.

When XC ceased doing business, it owed the Plaintiffs approximately $1.3 million. Of this amount, Plaintiffs have traced payments from builders to XC on their projects in excess of $1,019,900. The Plaintiffs mitigated some of their damages through collections received directly from builders. They seek to have declared nondischargeable the balance of their unpaid invoices, aggregating $723,156, multiplied by three for treble damages, plus attorney's fees and costs.

## II. Discussion

### A. Liability for Actual Damages Under Construction Trust Fund Statute

Plaintiffs seek to except their debts from discharge on the basis that their

debts arise from a breach of a fiduciary duty owed to them by the Debtor. Section 523(a)(4) of the Bankruptcy Code provides in part that a debt arising from "fraud or defalcation while acting in a fiduciary capacity" is nondischargeable in bankruptcy. The Tenth Circuit has construed this statute's reference to a "fiduciary" relationship narrowly. To satisfy its requirements, the Plaintiffs must prove: (1) the existence of a technical trust; (2) that the Debtor owed a fiduciary duty arising from the trust; and (3) that the debtor breached the fiduciary duty by defalcation. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371–72 (10th Cir.1996).

■ Colorado's legislators have imposed a statutory trust on all funds disbursed to a contractor or subcontractor for the benefit of laborers and suppliers who have furnished services or supplies on a particular construction project. It provides:

All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

Colo.Rev.Stat. § 38–22–127(1). Thus, the statute caused the funds passed from a builder to XC on a particular construction project to be held in trust for the payment of XC's suppliers and laborers on that project. This statutory trust satisfies the technical trust element of a fiduciary relationship necessary to establish a 11 U.S.C. § 523(a)(4) claim.

### 1. *Burden of Proof on Accounting*

In this case, neither party produced to the Court adequate records to track disbursements from builders to XC on particular properties, and then to the corresponding invoices from the Plaintiffs. The Debtor has argued that the burden of tracking rests on the Plaintiffs in the first instance. The trust fund statute ends with the phrase "for which such disbursement was made." Colo.Rev.Stat. § 38–22–127(1). According to the Debtor, this language requires the Plaintiffs to demonstrate that disbursements from the builders were for the Plaintiffs' benefit.

■ The Debtor's interpretation, however, does not recognize that Colorado's construction trust fund statute imposes a further duty on the contractor to account for the trust funds.

Every contractor or subcontractor shall maintain separate records of account for each project or contract, but nothing contained in this section shall be construed as requiring a contractor or subcontractor to deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section.

Colo.Rev.Stat. § 38–22–127(4). There was nothing improper in XC's use of a single bank account, but it had to compensate for this by keeping separate books and records on either a project or contract basis. As a result, the statute imposes the duty on the contractor, here XC, to account for the funds. *See also Stetson Ridge Assocs. v. Walker (In re Walker)*, 315 B.R. 595 (Bankr.D.Colo.2004), *rev'd on other grounds*, 325 B.R. 598 (D.Colo.2005); *Bemas Construction, Inc. v. Dorland (In re Dorland)*, 374 B.R. 765 (Bankr.D.Colo.

2007); *Antlers Roof–Truss and Builders Supply v. Storie (In re Storie),* 216 B.R. 283 (10th Cir. BAP 1997) (construing burden of proof under 11 U.S.C. § 523(a)(4) in similar context against an Oklahoma contractor).

■ Nevertheless, Plaintiffs had a burden of going forward with evidence that demonstrated they had unpaid invoices from projects on which XC had received disbursements from builders. To satisfy this burden, Plaintiffs tendered summary exhibits to the Court to demonstrate the disbursements made by builders corresponding with Plaintiffs' unpaid invoices. In a chart form, Plaintiffs listed a specific street address for each construction project, gave the corresponding unpaid invoices of the Plaintiffs, the name of the builder, XC's corresponding "Job Number," XC's invoices given to the builder on the project, and disbursements by the builder on that project. On several projects, Plaintiffs' unpaid invoices exceeded the amount that XC had received from the builder on the project and, therefore, Plaintiffs reduced their nondischargeability claim to the lower figure, representing the amount that XC had received in trust.

■ On cross examination, the Debtor demonstrated that the back-up documentation supporting the summary charts (Plaintiffs' invoices) was insufficient to tie the Plaintiffs' invoices to specific properties, because many of the invoices contained no reference to a street address. Plaintiffs' representative testified that, in some instances, the delivery tickets, rather than the invoices, contained this information. Plaintiffs did not, however, make the delivery tickets available for the Debtor's inspection, as required by Fed.R.Evid. 1006. Nevertheless, the Debtor did not object to the admission of these summaries (Exhibits 16–21) into evidence and, therefore, the Court received them. Consequently, the Court has before it evidence demonstrating that XC received disbursements on projects on which Plaintiffs supplied concrete but were not fully paid.

■■ This production shifted the burden to the Debtor to show that all builder disbursements on a particular property were used to pay XC's suppliers and laborers on that property. Unless and until XC's suppliers and laborers were paid in full, XC could not use any of the builder funds on a project to pay its overhead, Debtor's compensation, vendors on other projects, or to put them to any other use. In other words, until the workers and vendors on a particular project were paid in full, all builder funds disbursed on that project had to go to the workers and vendors on that project. If the Debtor had shown that all funds were disbursed in this manner, but it was still insufficient to pay all suppliers and workers in full, then the Debtor would face no liability under the statute. If a contractor receives no trust funds or receives insufficient trust funds to fully repay its suppliers and workers, the statute imposes no liability. If a contractor receives trust funds and uses them to prefer certain subcontractors on the project over others, it is unlikely that liability would attach under this statute, unless the funds are specially earmarked for a particular subcontractor or supplier. Liability only attaches when a contractor receives funds in trust but then redirects them to another purpose.

■ The Debtor testified, and on cross examination he elicited similar testimony from the Plaintiffs' representative, that the Plaintiffs were not the only suppliers that XC had to pay. In fact, XC regularly

incurred obligations to other suppliers, equipment lessors, and laborers on its projects. But the Debtor did not demonstrate *on a project basis* that all trust funds were disbursed to the suppliers and laborers *on the particular project*. To the contrary, testimony revealed that, once XC began experiencing severe cash flow problems, it used whatever funds were available to pay the vendor who made the most vocal demands and/or that it needed most to complete one of its projects. The Debtor did not establish that the funds were used only to pay for the particular project for which the builder made the payment. Similarly, in *In re Regan*,[1] faced with a cash flow shortage, the contractor began paying the oldest invoice first, regardless of the project for which the monies were allocated, which led to the supplier not being fully paid on a project, even though the builder had fully paid the contractor on that project. The *Regan* court held the contractor liable under the trust fund statute.

█ The Debtor demonstrated that in some instances the Plaintiffs' invoices on a project were dated after the date on which XC had received a payment from the builder on that project. The Debtor argued that the builder could not have made the payment *for the Plaintiffs*, if the Plaintiffs had not yet billed XC on the project. The contractor's officer made a similar argument in *Flooring Design Assocs., Inc., v. Novick*, 923 P.2d 216 (Colo.App.1995). In that case, the contractor received full payment at the closing on the sale of the home, but did not pay the flooring subcontractor in full. Instead funds were used to pay other corporate obligations, such as corporate vehicle loans and corporate cred-

it cards. Its officer argued that the trust fund statute should only apply if the plaintiff could show that the disburser specifically intended that the funds be used to pay subcontractors. The court of appeals disagreed. It found that the funds were held in trust regardless of the disburser's intentions. Thus, it was not necessary for the Plaintiffs to demonstrate that the builders intended to pay a particular subcontractor or supplier.

█ Nor is it necessary to demonstrate that the particular supplier had already invoiced the contractor before receiving the disbursement from the builder. The statute does not demand that each builder disbursement be tied to then existing debts for supplies or labor. *See Mangum v. Siegfried (In re Siegfried)*, 5 Fed. Appx. 856 (10th Cir.2001) (unpublished) (holding "have furnished" in the statute did not limit protection to those who performed work prior to disbursement of funds). Instead it treats all payments made on a project as a separate pot of funds. Funds can be pulled out of the pot and used at any time, but only to go toward suppliers or laborers who worked on that project. The timing of the work does not matter. The selection of one supplier over another does not matter, absent special earmarking of the funds. The one restriction is that the funds in that pot not be used for anything other than suppliers and laborers that contributed toward that project or contract at some point in time, until they have all been paid in full. Likewise, the record keeping need not apply payments to any particular invoice of a vendor, except that it must show that payment was made on one or more of the

---

1. *Fowler & Peth, Inc. v. Regan (In re Regan)*, 311 B.R. 271 (Bankr.D.Colo.2004), *rev'd on other grounds and remanded*, 326 B.R. 175 (D.Colo.2005), *rev'd* 477 F.3d 1209 (10th Cir. 2007), *and order aff'd* 2007 WL 1346576 (D.Colo.2007).

invoices due to the vendor *on that particular project.*

### 2. *Plaintiffs' Exercise of Control Not Relevant*

 The Debtor also argued that the trust fund statute should not apply to this case because the Debtor did not exercise control over the funds. Its suppliers and subcontractors directed the flow of the funds. In other words, Plaintiffs and other vendors made demands for payment and they chose how the funds were to be applied, often applying them to the oldest invoices, without regard to whether those invoices related to the same project. The Court does not doubt that vendors put this type of pressure on XC, but the statute required XC to apply the funds in a certain manner and to keep adequate accounting to demonstrate compliance, regardless of any pressures placed on XC to do otherwise. This was not a duty that XC could delegate. As XC's president and as the officer in charge of XC's funds, the Debtor is personally liable for any breach of these duties. *See Alexander Co. v. Packard,* 754 P.2d 780 (Colo.App.1988).

### 3. *Calculation of Actual Damages*

 As a result of the Debtor's violation of this statute, Plaintiffs are entitled to recover damages. Plaintiffs have calculated their damages by starting with the figure of $1,019,900.56. This amount represents the amount of disbursements made by builders on projects where Plaintiffs supplied concrete, but remain unpaid, as reflected in Exhibits 16–21. Plaintiffs have reduced these damages based on set-

tlements they made directly with builders. Consequently, they now claim actual damages of $723,156.46. They also seek prejudgment interest at the statutory rate from the date of the breach of the fiduciary duty.[2]

The Debtor contests this calculation of damages. He asserts that the amount of money the Plaintiffs collected from builders directly ($581,347.37) should be offset against the amount of the trust fund liability ($1,019,900), reducing his liability to $438,553, instead of the $723,156 figure requested by Plaintiffs. Plaintiffs arrived at the higher figure, by offsetting the collections ($581,347.37) against the total amount of their unpaid invoices (approximately $1,300,000).

This dispute raises a novel question. When a debt is comprised of both a dischargeable portion and a nondischargeable portion, should recovery from another source or mitigation of damages in some fashion be applied against the nondischargeable portion, the dischargeable portion, or the entire debt? The parties have provided the Court with no authorities addressing this issue, nor has the Court located any decisions shedding much light on this issue.

 In analyzing this issue, it is important to distinguish between a determination as to the allowance and amount of a claim, and a determination as to the dischargeability of a claim. In nondischargeability proceedings, the dischargeability claim arises, not to dispute the validity or amount of the underlying debt, but rather "to meet ... the new defense of bankruptcy which [the debtor] has inter-

---

2. *In re Barnes,* 377 B.R. 289 (Bankr.D.Colo. 2007) (statutory rate of 8% from the date the breach of trust occurred).

posed between [the creditor] and the sum determined to be due him." *Brown v. Felsen,* 442 U.S. 127, 133, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). "While mitigation of damages impacts the amount of the claim, it does not affect the determination of dischargeability." *In re Maldonado,* 228 B.R. 735, 740 (9th Cir.BAP1999). In the dischargeability action, the Court renders a decision as to whether the debt, whatever its amount is determined to be at that time, is nondischargeable, in whole or in part.

Thus, while both parties made good arguments, the Court finds the better view to be that collections or recoveries made from another source, either before or after a dischargeability trial, should be credited to the entire indebtedness. One possible exception to this rule would be when the recovery from another source is directly tied to the nondischargeable portion of the debt.[3] In this case, the amount the Plaintiffs collected from the builders directly ($581,347.37) was not a recovery of the trust funds improperly disbursed, but represented additional payment for work performed on the projects. Thus, it is logical to apply the collections to the entire debt owed to the Plaintiffs.

This result comports with the purpose of the trust fund statute. The statute imposes liability whenever funds are received in trust but not disbursed in accordance with the trust's directives. Liability should then be tied to the amount of the improper disbursement, and only reduced by recovery of the improper disbursements or the reduction of the overall claim.

The Court recognizes the harshness of this result, especially in this particular case. The Court strongly suspects that, if the Debtor had been able to trace the disbursements, his liability might have been substantially reduced or eliminated. The lack of accounting has imposed a sort of strict liability on the Debtor. But this appears to be the intent of Colorado's trust fund statute and this Court cannot substitute its judgment for that of the legislature.

### B. *Liability for Treble Damages and Fees and Costs Under Civil Theft Statute*

In addition to actual damages, Plaintiffs are seeking treble damages, plus fees and costs. These additional amounts may be awarded when a plaintiff establishes the defendant committed "theft." Colorado's trust fund statute itself states: "Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18–4–401, C.R.S." Colo.Rev.Stat. § 38–22–127(5).

Despite this language in the trust fund statute, the Colorado Supreme Court has held that evidence of a violation of Colo. Rev.Stat. § 38–22–127 by itself does not lead to *criminal* liability under § 18–4–401. Instead, the prosecution must prove all of the elements of the theft statute to obtain a criminal conviction, including the requisite intent. *People v. Mendro,* 731 P.2d 704, 706–07 (Colo.1987); *accord People v. Erickson,* 695 P.2d 804, 805 (Colo. App.1984).

Colo.Rev. Stat. § 18–4–401 sets for the following elements of criminal theft:

---

**3.** Consider the example of a debtor who owed two debts to his former employer, one for theft and one for an employee loan. Assuming the loan is a dischargeable debt, the employer then holds both a nondischargeable debt (for theft) and a dischargeable debt (for a loan). If the employer recovers from an insurer that insured against employee theft, then the insurance proceeds should be credited toward the nondischargeable debt.

(1) A person commits theft when he knowingly obtains or exercises control over any thing of value of another without authorization, or by threat or deception, and;

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment or abandonment will deprive the other person permanently of its use and benefit; or

(d) Demands any consideration to which he is not legally entitled as a condition of restoring the thing of value to the other person.

■ Once a theft has been established, Colo.Rev.Stat. § 18–4–405 provides a private civil remedy for criminal theft, providing, in relevant part:

"All property obtained by theft ... shall be restored to the owner. ... The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. In any such action, the owner may recover ... three times the amount of actual damages sustained by him ... and may also recover costs of the action and reasonable attorney fees. ..."

A criminal conviction is not a prerequisite to recovering treble damages as a civil remedy for theft. *Itin v. Ungar*, 17 P.3d 129 (Colo.2000). But the civil plaintiff must prove all of the statutory elements of theft, including the necessary element of intent. *Id. at 134.* In the context of a construction trust fund violation, this intent may be established whenever:

the offender knowingly obtains control over the property of another without authorization and, even though not intending to deprive the other person permanently of the use or benefit of the property, nonetheless knowingly uses the property in such manner as to deprive the other person permanently of the use or benefit of the property. ... In the context of theft of construction project trust funds, the "knowingly using" element of mental culpability in subsection 18–4–401(1)(b) does not require a conscious objective to deprive another person of the use or benefit of the construction trust funds, but instead requires the offender to be aware that his manner of using trust funds is *practically certain* to result in depriving another person of the use or benefit of the funds.

*People v. Anderson*, 773 P.2d 542, 545 (Colo.1989) (emphasis added). Thus, whenever a theft claim is based on the offender "knowingly" obtaining property of the supplier without authorization, the civil plaintiff must at least establish that the contractor was aware that his manner of using trust funds was "practically certain" to result in depriving the supplier of his funds. *See also In re Barnes*, 377 B.R. 289 (Bankr.D.Colo.2007).

■ In determining whether a debtor's knowing use of trust funds was "practically certain" to deprive the beneficiary of the funds, the issue is not whether the debtor had, or reasonably expected to have, other funds available to replenish the trust. *In re Helmke*, 398 B.R. 38 (Bankr.D.Colo. 2008). The question is whether the Debt-

or's actions made it practically certain that the Plaintiffs would be deprived of the use of *the trust funds,* an identifiable *res. Id.* at 2. Thus, the Plaintiffs did not have to negate the Debtor's testimony that he was infusing new capital into the business and that he reasonably believed he would be able to pay the Plaintiffs at some point in time. The Plaintiffs need only show that the Debtor deposited these specially earmarked joint checks, but did not transmit *those funds* to the Plaintiffs.

Plaintiffs' evidence in this case did not meet this standard. Plaintiffs established that the Debtor deposited 18 checks, which were made payable jointly to XC and the Plaintiffs, without the express consent or knowledge of the Plaintiffs. The Debtor testified this had been a longstanding practice between the parties. The Court found the Debtor credible on this issue. After depositing the checks, the Debtor then had a duty to transmit the funds to Plaintiffs. But there was no evidence that established what became of these funds after the Debtor deposited them. In closing, Plaintiffs' counsel indicated that Plaintiffs received "most of the funds." Statements of counsel are not evidence, but this statement is in essence an admission that most of the funds were properly transmitted. The problem is that the Court has no way to determine the amount of funds that were not disbursed to the Plaintiffs. While the Debtor bears the burden of accounting under the trust fund statute, the burden rested with the Plaintiffs on the civil theft claim. As a result, Plaintiffs have not satisfied their burden of proving

"theft" and, therefore, they are not entitled to treble damages and fees and costs.

### III. Conclusion

For these reasons, judgment shall enter in favor of Plaintiffs and against Defendant, holding the indebtedness owed by Defendant to Plaintiffs, in the amount of $723,156.46, to be nondischargeable under 11 U.S.C. § 523(a)(4), plus prejudgment interest at the statutory rate.