[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11686
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 14, 2012
JOHN LEY
CLERK

D.C. Docket No. 5:10-cv-01905-IPJ,
BKCY No. 8:09-bk-84300-JAC-7

In Re: RANDY CURTIS BULLOCK,

                                                                    Debtor.

_____

RANDY CURTIS BULLOCK,

                                                                    Appellant,

versus

BANKCHAMPAIGN, N.A.,

                                                                    Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 14, 2012)

Before BARKETT and PRYOR, Circuit Judges, and BUCKLEW,* District Judge.

_____

*Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida,
sitting by designation.

BUCKLEW, District Judge:

Appellant Randy Curtis Bullock, Debtor-Defendant in the underlying bankruptcy adversary proceeding, appeals the district court's decision affirming the bankruptcy court's determination that the Illinois judgment debt owed to Appellee BankChampaign, N.A. is not dischargeable, pursuant to 11 U.S.C. § 523(a)(4). After careful review and with the benefit of oral argument, we affirm.

## I.  Background

In 1978, Appellant Bullock became the trustee of his father's trust. The trust's sole asset was a life insurance policy on his father's life, and Bullock and Bullock's four siblings were the beneficiaries. The terms of the trust provided that Bullock, as trustee, could borrow from the trust in only two situations: (1) to pay the life insurance premiums, and (2) to satisfy a beneficiary's request for withdrawal.

Despite the trust's limitations on borrowing, Bullock borrowed from the trust by making three loans that were secured by the cash value of the life insurance policy. First, in 1981, upon his father's request, Bullock borrowed $117,545.96 for his mother so she could repay a debt that she owed to Bullock's father's business. Second, in 1984, Bullock borrowed $80,257.04 for his mother and himself to purchase certificates of deposit, which were later cashed in and

2

used toward the purchase of a garage fabrication mill in Ohio. Third, in 1990, Bullock borrowed $66,223.96 for his mother and himself to purchase real estate. These loans were all fully repaid.

Thereafter, Bullock's two brothers learned of the existence of the trust, and they filed suit against Bullock in Illinois state court. In the lawsuit, Bullock's brothers claimed that Bullock had breached his fiduciary duty as trustee by engaging in self-dealing via the three loans. The brothers moved for summary judgment on that claim, and in 2002, the Illinois court granted their motion. Specifically, the Illinois court stated that it could not "be disputed the loans made by [Bullock] while acting as trustee are considered self-dealing transactions. All of the loans were made to entities [Bullock] had a financial interest in or to a relative." [R:Tab K].

In its order awarding damages for the self-dealing, the Illinois court stated that Bullock did "not appear to have had a malicious motive in borrowing funds from the trust." [R:Tab M, Ex. 7]. However, the Illinois court concluded that "neither the facts and circumstances surrounding the loans nor the motives of [Bullock] can excuse him from liability." [R:Tab M, Ex. 7]. As a result, the Illinois court determined that damages should be awarded based on the benefit that Bullock received due to the self-dealing. The Illinois court stated that such would

3

be hard to quantify, but based on its equitable powers, it determined that $250,000 represented the amount of the benefit that Bullock had received from the self-dealing. In addition, the Illinois court ordered that Bullock pay $35,000 in attorneys' fees. The Illinois court also put the property obtained with the self-dealt funds (a mill located in Ohio) under a constructive trust to secure it as collateral for the $285,000 judgment amount. The Illinois court placed another constructive trust on Bullock's beneficial interest in his father's trust as an additional source of collateral for the judgment.

The constructive trusts were awarded to Appellee BankChampaign ("Bank"), which had replaced Bullock as the trustee of his father's trust. Bullock contends that the Bank, as trustee, has blocked his attempts to sell or lease the mill property located in Ohio, which has prevented him from satisfying the Illinois judgment.[1]

Thereafter, in 2009, Bullock filed for bankruptcy under Chapter 7 in hopes that he could discharge the Illinois judgment debt. The Bank initiated an adversary proceeding to determine the dischargeability of the judgment debt pursuant to 11 U.S.C. § 523(a)(4). Section 523(a)(4) provides that debts arising

---

[1]Because the Illinois court awarded the Bank a constructive trust over the Ohio mill, Bullock is unable to sell or lease the mill without the approval and cooperation of the Bank.

from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" are not dischargeable in bankruptcy. The Bank moved for summary judgment, arguing that the Illinois judgment debt was not dischargeable, and the bankruptcy court granted the Bank's motion.

Specifically, the bankruptcy court concluded that Bullock was collaterally estopped from attacking the Illinois judgment. The Illinois court had determined that Bullock had breached his fiduciary duty by self-dealing via the three loans. The bankruptcy court accepted the Illinois court's determination that Bullock had breached his fiduciary duty by engaging in self-dealing and concluded that such conduct amounted to fraud and defalcation. As a result, the bankruptcy court found that the Illinois judgment was a debt arising from fraud or defalcation while Bullock was acting in a fiduciary capacity, and as such, the judgment debt was not dischargeable, pursuant to § 523(a)(4).

Bullock appealed the bankruptcy court's judgment to the district court. The district court affirmed the bankruptcy court's decision, but it sympathized with Bullock's predicament—he had a judgment debt that he could satisfy only by selling the underlying collateral, but the Bank persisted in preventing the sale. The district court stated that it questioned the propriety of the Bank's actions and noted that holding collateral hostage in perpetuity is impermissible. However, the

5

district court recognized that the propriety of the Bank's actions was not a basis for finding that the judgment debt should be discharged. As a result, the district court concluded that while it was "convinced [the Bank] is abusing its position of trust by failing to liquidate the [property], this issue is not properly before this court, but rather should [be] brought by Bullock in an action in Illinois to consider the malfeasance of the trustee." [R:Tab G].

Thereafter, Bullock filed the instant appeal. In this appeal, Bullock argues that the bankruptcy court erred in two ways: (1) by concluding that the Illinois judgment was non-dischargeable, pursuant to § 523(a)(4); and (2) by failing to consider his affirmative defense that the Bank has acted wrongfully by impeding his attempts to sell or lease the collateralized property.

## II.  Standard of Review

"Because the district court in reviewing the decision of a bankruptcy court functions as an appellate court, we are the second appellate court to consider this case. Thus, this Court's review with regard to determinations of law, whether made by the bankruptcy court or by the district court, is de novo. The district court makes no independent factual findings; accordingly, we review solely the bankruptcy court's factual determinations under the 'clearly erroneous' standard." In re Colortex Indus., Inc., 19 F.3d 1371, 1374 (11th Cir. 1994) (citations

6

omitted).

## III.  Section 523(a)(4)

In determining whether the Illinois judgment debt should be discharged, this

Court is mindful of the purpose of the Bankruptcy Code:

> A central purpose of the Bankruptcy Code is to provide an opportunity for certain insolvent debtors to discharge their debts and enjoy a fresh start.  However, Congress has decided to exclude from the general policy of discharge certain categories of debts.  One of these categories includes debts incurred by fraud or defalcation while acting in a fiduciary capacity.  Such a debt is non-dischargeable [under 11 U.S.C. § 523(a)(4)].  Congress evidently concluded that the creditors' interest in recovering full payment of such debts . . . outweighed the debtors' interest in a complete fresh start.

Eavenson v. Ramey, 243 B.R. 160, 164 (N.D. Ga. 1999) (alterations, citations, and

internal quotation marks omitted).  Furthermore, this Court must keep in mind that

exceptions to discharge, such as § 523(a)(4), must be construed narrowly, and the

burden is on the creditor to show that the exception to discharge applies.  See In re

Mitchell, 633 F.3d 1319, 1327 (11th Cir. 2011) (citations omitted).

In the underlying adversary proceeding, the Bank asked the bankruptcy

court to find the Illinois judgment debt to be non-dischargeable under § 523(a)(4).

The bankruptcy court concluded that the debt was not dischargeable because the

Bank had established that the debt arose from fraud or defalcation while Bullock was acting in a fiduciary capacity. The parties do not dispute that the judgment debt arose from conduct that occurred while Bullock was acting in a fiduciary capacity (i.e., while he was the trustee of his father's trust). Furthermore, at oral argument, Bullock appeared to concede that he was collaterally estopped from attacking the Illinois judgment to the extent that the Illinois court concluded that he breached his fiduciary duty as the trustee of his father's trust by engaging in self-dealing via the three loans. Thus, the issue before this Court is whether the bankruptcy court correctly characterized Bullock's conduct as fraud and/or defalcation under § 523(a)(4). Upon consideration, we find that Bullock's conduct constituted defalcation under § 523(a)(4).[2]

This Court has stated that a "'[d]efalcation' refers to a failure to produce funds entrusted to a fiduciary" and that "the precise meaning of 'defalcation' for purposes of § 523(a)(4) has never been entirely clear." Quaif v. Johnson, 4 F.3d 950, 955 (11th Cir. 1993) (citations omitted). However, this Court has referred to the Second Circuit's decision in Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510 (2d Cir. 1937), as containing "perhaps the best" analysis of the meaning

---

[2]Because we find that Bullock's conduct constituted defalcation under § 523(a)(4), we need not reach the issue of whether his conduct also constituted fraud under § 523(a)(4).

of "defalcation" under § 523(a)(4).[3]  Quaif, 4 F.3d at 955; see also In re

Fernandez-Rocha, 451 F.3d 813, 817 (11th Cir. 2006).

In Central Hanover, an issue before the court was whether Herbst, who had

been appointed as a receiver for real property in a foreclosure action, had

committed a defalcation when he withdrew money that the court had awarded him

as payment for his services as receiver before the time to appeal the order

awarding him the money had expired.  See Central Hanover, 93 F.2d at 511.  The

Central Hanover court analyzed the bankruptcy statute that provided that debts

arising from fraud, embezzlement, misappropriation, or defalcation while acting as

an officer or in a fiduciary capacity were not dischargeable.  See id.  In analyzing

the meaning of defalcation, the Central Hanover court stated the following:

> Whatever was the original meaning of defalcation, it must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'
>
> . . .
>
> In the case at bar [Herbst] had not been entirely innocent . . . . A judge had awarded him the money, and prima facie he was entitled to it; but he knew, or if he did not know, he was charged with notice (having held himself out as competent to be an officer of the court), that the order would not protect him if it were reversed; and that it

---

[3]The court in Central Hanover analyzed the meaning of defalcation under the predecessor statute to § 523(a)(4).

might be reversed until the time to appeal had expired. He made no effort to learn from the plaintiff whether it meant to appeal, and he did not wait until it could no longer do so; he took his chances. We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; . . . [we have said] that the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake. Although [misappropriation] probably carries a larger implication of misconduct than defalcation, defalcation may demand some portion of misconduct; we will assume arguendo that it does.

All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a defalcation though it may not be a fraud, or an embezzlement, or perhaps not even a misappropriation.

Id. at 511, 512 (citation and internal quotation marks).

In Quaif, this Court interpreted Central Hanover as standing for the proposition that a defalcation under § 523(a)(4) does not have to rise to the level of fraud, embezzlement, or misappropriation.[4] See Quaif, 4 F.3d at 955. Additionally, this Court in Quaif noted that some courts interpret defalcation "more broadly, stating that even a purely innocent party can be deemed to have committed a defalcation for purposes of § 523(a)(4)." Id. (citations omitted).

_____

[4]In Quaif, an issue before the Court was whether an agent who failed to remit insurance premiums, and instead commingled the money with his company's funds and used the funds to pay his company's operating expenses, committed a defalcation. See Quaif, 4 F.3d at 952. The Quaif Court held that the agent's conduct was a defalcation within the meaning of § 523(a)(4). See id. at 955.

10

This Court recognizes that there is a split among the circuits regarding the meaning of defalcation under § 523(a)(4). The Fourth, Eighth, and Ninth Circuits have concluded that even an innocent act by a fiduciary can be a defalcation. See In re Uwimana, 274 F.3d 806, 811 (4th Cir. 2001) (stating that "even an innocent mistake which results in misappropriation or failure to account" can be a defalcation); In re Cochrane, 124 F.3d 978, 984 (8th Cir. 1997) (concluding that defalcation does not require intentional wrongdoing; stating that it includes a fiduciary's innocent failure to fully account for money received); In re Sherman, 658 F.3d 1009, 1017 (9th Cir. 2011) (noting that intent to defraud is not required; stating that defalcation includes a fiduciary's innocent failure to fully account for money received). The Fifth, Sixth, and Seventh Circuits require a showing of recklessness by the fiduciary. See In re Harwood, 637 F.3d 615, 624 (5th Cir. 2011) (stating that defalcation is a willful neglect of a duty, which does not require actual intent; it is essentially a recklessness standard); In re Patel, 565 F.3d 963, 970 (6th Cir. 2009) (stating that a defalcation requires a showing of more than negligence; instead, the fiduciary "must have been objectively reckless in failing to properly account for or allocate funds"); In re Berman, 629 F.3d 761, 766 n.3 (7th Cir. 2011) (stating that "defalcation requires something more than negligence or mistake, but less than fraud"). The First and Second Circuits require a showing

11

of extreme recklessness.[5] See In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002) (stating that "defalcation requires something close to a showing of extreme recklessness"); In re Hyman, 502 F.3d 61, 68 (2d Cir. 2007) (stating that defalcation "requires a showing of conscious misbehavior or extreme recklessness"). The Third Circuit has not addressed the issue, and the Tenth Circuit has made the brief statement in an unpublished opinion that defalcation requires some portion of misconduct. See In re Millikan, 188 F. App'x 699, 702 (10th Cir. 2006).

Given our Circuit's explicit alignment with the Central Hanover case, this Court finds that defalcation under § 523(a)(4) requires more than mere negligence. Instead, this Court concludes that defalcation requires a known breach of a fiduciary duty, such that the conduct can be characterized as objectively reckless. As such, this Circuit aligns itself with the Fifth, Sixth, and Seventh Circuits, which hold that defalcation under § 523(a)(4) requires a showing of recklessness by the fiduciary.

Applying the recklessness standard for defalcation to the facts of the instant case, this Court concludes that the bankruptcy court was correct in determining that Bullock committed a defalcation by making the three loans while he was the

---

[5]In 2007, the Second Circuit re-evaluated the position that it took in the Central Hanover case and determined that it would align itself with the First Circuit when defining defalcation under § 523(a)(4).

trustee of his father's trust. Because Bullock was the trustee of the trust, he certainly should have known that he was engaging in self-dealing, given that he knowingly benefitted from the loans. Thus, his conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4). Accordingly, the bankruptcy court's order must be affirmed on the issue of whether the Illinois judgment debt was non-dischargeable under § 523(a)(4) as a debt arising from a defalcation while Bullock was acting in a fiduciary capacity.

## IV. Affirmative Defense

Bullock also argues that the bankruptcy court erred in failing to consider his affirmative defense that the Bank has acted wrongfully by impeding his attempts to sell or lease the collateralized property. Bullock cites Heller v. Lee, 474 N.E.2d 856 (Ill. App. Ct. 1985), in support of his argument that the Bank's conduct has been wrongful.

In Heller, the plaintiffs obtained a judgment of more than $44,000 against the defendants. See id. at 857. The defendants had put up a bond consisting of a $15,000 certificate of deposit and a deed to real property appraised at $50,000. See id. After the judgment was affirmed on appeal, the plaintiffs moved to release the bond, and the plaintiffs applied the $15,000 certificate of deposit to the

13

outstanding judgment.  See id.  Thereafter, the defendants moved under an Illinois statute for a release from the judgment due to the plaintiffs acquiring the deed to the real property via the release of the bond.  See id.  While the court found that the defendants did not satisfy the requirement for release from judgment under the Illinois statute, the court found that the defendants were entitled to equitable relief and stated the following:

> The plaintiffs contend that they took the property as security for eventual cash payment of the judgment.  We agree.  But, as matters now stand, the plaintiffs can sit on the property indefinitely and institute supplemental proceedings to recover the rest of the judgment.  Thus the plaintiffs have the use and enjoyment of a valuable piece of property while the defendants, who put the property up as bond expecting it to satisfy the judgment, are not only deprived of the property, but may also be compelled to dig even deeper in order to pay the judgment.  Such a result is inequitable.  The plaintiffs have received a windfall at the defendants' expense.  If, as the plaintiffs contend, the transfer of the real estate was intended to secure the judgment, then by taking the deed, the plaintiffs acquired only a lien.  Rather than proceed against the defendants to recover the judgment, the equitable solution is for the plaintiffs to foreclose on their lien by selling the property.
>
> We are guided in this result by the maxim that equity regards as done that which ought to be done. The parties intended the property to secure the judgment. Therefore, the property should be used to satisfy the judgment.
> . . . The cause is remanded and the trial court is directed to sell the property, apply the proceeds to the judgment, and remit the excess, if any, to the defendants.

Id. at 858.

Thus, based on Heller, Bullock argues that the Bank's actions regarding the collateral in this case have been wrongful and inequitable. Bullock takes this argument a step further and contends that because the bankruptcy court is a court of equity, and because the Bank has come to the bankruptcy court with unclean hands due to its wrongful conduct, the bankruptcy court should deny the Bank its requested relief of non-dischargeability. See Matter of Garfinkle, 672 F.2d 1340, 1347 n.7 (11th Cir. 1982) ("The doctrine [of unclean hands] is applicable in a court of equity to deny a plaintiff the relief he seeks even though his claim might otherwise be meritorious. The principles of equity govern the exercise of a bankruptcy court's jurisdiction.").

Bullock, however, has not cited any cases in which a court found a debt met the requirements of non-dischargeability under § 523(a) but ultimately concluded that the debt was dischargeable due to the creditor's unclean hands. Therefore, this Court concludes that the district court correctly determined that the propriety of the Bank's actions is not a basis for finding that the Illinois judgment debt should be discharged. Instead, this Court agrees with the district court's statement that while it was "convinced [the Bank] is abusing its position of trust by failing to liquidate the [property], this issue is not properly before this court, but rather

15

should [be] brought by Bullock in an action in Illinois to consider the malfeasance of the trustee." [R:Tab G].

This Court notes that if it accepted Bullock's argument and concluded that the judgment debt was dischargeable, Bullock would ultimately pay nothing more on the debt, as the debt would be discharged. However, if Bullock goes back to the Illinois court and raises the issue of the Bank's inequitable conduct, the Illinois court may order the Bank to liquidate the collateral, and as a result, it is possible that the Bank could be paid from the sale and that the judgment debt could be reduced or eliminated.[6] Thus, having Bullock go to the Illinois court to raise the issue of the Bank's inequitable conduct would likely lead to the most equitable resolution of the situation.

## V. Conclusion

Accordingly, the decision of the bankruptcy court is **AFFIRMED**.

---

[6]The market value of the collateral is not in the record before this Court.