**IN RE: Daniel J. CUPIT, Debtor.**

**MacArthur Company, Plaintiff,**

v.

**Daniel J. Cupit, Defendant.**

**Bankruptcy Case No. 13-11914 EEB**
**Adversary Proceeding No. 13-1185 EEB**

United States Bankruptcy
Court, D. Colorado.

Signed July 18, 2014

Guy B. Humphries, Denver, CO, for Defendant.

Phillip Jones, Grand Junction, CO, for Plaintiff.

Chapter 7

**ORDER**

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court on the Plaintiff's Complaint, alleging a nondischargeability claim under 11 U.S.C. § 523(a)(4). This statute renders a claim nondischargeable if it involves either defalcation while acting in a fiduciary capacity, larceny, or embezzlement. At issue is whether a roofing contractor's misapplication of funds under the Colorado Mechanic's Lien Trust Fund Statute (the "Construction Trust Fund Statute") amounts to either defalcation, as that term has been recently defined by the Supreme Court in *Bullock v. BankChampaign*, — U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), or as embezzlement. Following trial on this matter, the Court finds and

concludes that Debtor's obligation to Plaintiff is partially nondischargeable as a fiduciary's defalcation debt.

## I. BACKGROUND

The Debtor is the owner and president of a roofing company, Professional Roofing, Inc. ("PRI"), which he formed in 2001. After running the business successfully for several years, Debtor decided to sell PRI to a third party. At the time of sale, Debtor testified that PRI was in good financial condition, was current on its payables, and had a positive cash flow. After the sale closed in 2010, the new owner took over control of PRI's finances and, according to Debtor, caused PRI to suffer a dramatic financial decline. When the new owner failed to make the required post-closing installment payments for his purchase of PRI, Debtor sued him. Ultimately, the parties reached a settlement agreement pursuant to which Debtor regained ownership and control of PRI as of January 1, 2011.

In the months that followed, Debtor reviewed PRI's finances and discovered that during the prior owner's five-month tenure, PRI had racked up over $600,000 in payables, but had insufficient receivables to cover them. Debtor also testified that the prior owner took significant amounts of cash out of PRI for his personal use and maxed out PRI's existing line of credit. Debtor put over $200,000 of his own personal funds into PRI to keep the business afloat. Nevertheless, PRI struggled to pay off old debts while keeping up with new payables.

Starting in May 2011, PRI started buying roofing materials from Plaintiff MacArthur Company ("MacArthur"), a supplier of roofing products. For each of its roofing jobs, PRI kept a "Job Cost Detail" that reflects the supplies Debtor purchased, how much it paid for those supplies, and if there was a balance owing to any supplier. *See* Ex. B. The Job Cost Detail also reflects the amount charged to PRI's customer and the payments received from that customer. These Job Cost Details demonstrate that PRI often did not use all the revenue from a particular job to pay the suppliers for that job. Instead, Debtor testified that some of the revenue, which was deposited in PRI's general operating account, went to pay other, unrelated bills. Debtor stated that he was generally attempting to pay PRI's oldest bills first. In total, PRI received full payment on twenty-four roofing jobs that used MacArthur materials, for which MacArthur was not paid in full (collectively, the "Jobs"). Ex. B. The unpaid balance on these invoices is $79,625.94. *Id.*

MacArthur is not the only supplier that went unpaid. Starting in August 2011, several other suppliers sued PRI and Debtor in state court for unpaid invoices and violation of the Construction Trust Fund Statute. Ex. 6, at 6–6; Ex 10. Because of these lawsuits, PRI eventually filed for chapter 11 bankruptcy protection. Debtor then filed his individual petition under chapter 7.

In this adversary proceeding, MacArthur alleges that the debt owed to it is nondischargeable under § 523(a)(4) because Debtor was acting in a fiduciary capacity pursuant to the Construction Trust Fund Statute and committed a defalcation by failing to pay MacArthur the construction trust funds it was owed. MacArthur further asserts that this alleged defalcation amounts to theft under Colorado law and entitles MacArthur to treble damages under Colo.Rev.Stat. § 18–4–405. In the alternative, MacArthur asserts Debtor's conduct amounts to larceny or embezzlement, which are also grounds for nondischargeability under § 523(a)(4).

Relying on the Supreme Court's recent decision in *Bullock v. BankChampaign,* — U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), Debtor argues his conduct does not rise to the level of "defalcation" because he allegedly had no knowledge of his fiduciary duties under the Construction Trust Fund Statute at the time. Debtor further contends that MacArthur failed to establish the necessary elements of either larceny or embezzlement and that the debt owed to MacArthur is dischargeable.

The Court first held a trial on this matter in October 2013. At the conclusion of MacArthur's case-in-chief, the Debtor moved for a judgment on partial findings under Fed.R.Civ.P. 52(c), made applicable to these proceedings by Fed. R. Bankr.P. 7052. The Court orally granted that motion, but indicated it would issue a later written order. Prior to entry of a final order and judgment, the Court reconsidered its decision, based in part on the lack of clarity surrounding the Supreme Court's decision in *Bullock.* The Court laid out its concerns in an order dated November 20, 2013 and held a non-evidentiary hearing on the matter. At the hearing, the parties made oral arguments, and the Court determined that it would defer ruling on the Debtor's motion for judgment on partial findings until the conclusion of trial and set a further trial date.

*See* Fed.R.Civ.P. 52(c) (giving a court discretion to "decline to render any judgment until the close of the evidence"). The Court then conducted a continued trial in March 2014. At the conclusion of trial, the parties submitted written closing arguments. The Court now concludes that the best course of action is to render a judgment based on all the evidence, testimony, and applicable law.[1] Accordingly, the Debtor's Rule 52(c) motion is DENIED.

## II. DISCUSSION

### A. Defalcation While Acting in a Fiduciary Capacity

#### 1. The *Bullock* Definition of Defalcation

■ In relevant part, § 523(a)(4) provides that there is no discharge of a debt for "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). The Tenth Circuit has construed § 523(a)(4)'s reference to a "fiduciary" relationship narrowly. To satisfy its requirements, MacArthur must prove: (1) the existence of an express or technical trust; (2) that Debtor owed a fiduciary duty arising from the trust; and (3) that Debtor breached the fiduciary duty by defalcation. *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1371–72 (10th Cir. 1996).

---

1. As stated above, a court has discretion to defer ruling on a Rule 52(c) motion until the end of trial. When a court rules on such a motion after a full trial, it need not limit itself to the state of the record as it existed at the time the motion was made (in this case, after MacArthur rested its case). *Trizechahn Gateway, LLC v. Oberdick (In re Oberdick),* 490 B.R. 687, 697 (Bankr.W.D.Pa.2013); *Gaffney v. Riverboat Svcs. of Ind., Inc.,* 451 F.3d 424, 451 (7th Cir.2006) (rejecting argument that evidence should be evaluated as of the time the motion was made); *Duval v. Midwest Auto City, Inc.,* 578 F.2d 721, 723–24 (8th Cir. 1978) (holding that once a defendant introduces evidence on its own behalf, sufficiency of evidence is tested on appeal by reviewing the entire record, even when the trial judge reserved ruling on the motion when made); *Diener v. McBeth (In re Diener),* 483 B.R. 196, 208–09 (9th Cir. BAP 2012) (same). Once Debtor put on his own evidence, the Court had discretion to consider the entire record. *In re Oberdick,* 490 B.R. at 697. Since the Court reviewed the entire record, a decision on Debtor's Rule 52(c) motion "would be tantamount to making a decision on the case after trial on the complete trial record, as if no such motion[] had ever been made," thereby making separate consideration of the Rule 52(c) motion "pointless." *Id.*

MacArthur relies on the Construction Trust Fund Statute to establish the existence of a trust and Debtor's fiduciary duty. It provides that:

All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

Colo.Rev.Stat. § 38–22–127(1). This section imposes a statutory trust on all funds disbursed to a contractor or subcontractor for the benefit of laborers and suppliers who have furnished services or supplies on a particular construction project. This statutory trust satisfies the technical trust element of a fiduciary relationship necessary to establish a § 523(a)(4) claim. *Fowler & Peth v. Regan (In re Regan)*, 477 F.3d 1209, 1211 n. 1 (10th Cir.2007). Thus, MacArthur has established the first two elements of its § 523(a)(4) claim: a technical trust was created from the funds paid to PRI by customers on the Jobs, and Debtor owed fiduciary duties under that trust. As PRI's president and as the officer in charge of PRI's funds, Debtor is personally liable for any breach of these duties. *See Alexander Co. v. Packard*, 754 P.2d 780, 782 (Colo.App.1988).

The third element—defalcation—is more problematic. Prior to the Supreme Court's *Bullock* decision, the standard for defalcation in the Tenth Circuit was relatively low, requiring only "some portion of misconduct." *Okla. Grocers Ass'n, Inc. v. Millikan (In re Millikan)*, 188 Fed.Appx. 699, 702 (10th Cir.2006) (unpublished). In

the context of a claim involving construction trust funds, courts in this circuit previously defined defalcation as "a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent. Furthermore, the fiduciary-debtor was charged with knowledge of the law and its duties." *Antlers Roof–Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997). Under this definition, the creditor needed to only establish a failure to account for trust funds (the *actus reus*), without establishing any certain mental state (the *mens rea*). A creditor could meet its burden on a § 523(a)(4) claim in this district by showing it had unpaid invoices on construction projects on which the debtor had received trust fund disbursements meant for subcontractors, material suppliers, or laborers. *See ASCI Readi–Mix & Asphalt Specialties, Co., Inc. v. Gamboa (In re Gamboa)*, 400 B.R. 784, 790 (Bankr. D.Colo.2008). The burden then shifted to the debtor to render an accounting to show that all contract disbursements on a particular project were used first to pay all subcontractors, material suppliers and laborers on that project, and not put to some other use. *Id.* If the debtor failed to meet this burden, then the defalcation standard would be met, even if the debtor was, at the time, unaware of the fiduciary duties imposed by the Construction Trust Fund Statute. *Id.*

In *Bullock*, the Supreme Court resolved a split among the circuits as to the meaning of defalcation by holding that it requires proof of an "intentional wrong." *Bullock v. BankChampaign, N.A.*, —— U.S. ——, 133 S.Ct. 1754, 1759, 185 L.Ed.2d 922 (2013). An intentional wrong includes not only conduct that the fiduciary knows is improper, but also reckless

conduct. *Id.* Thus, liability can be imposed where the fiduciary " 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (quoting Model Penal Code § 2.02(2)(c)). The risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* (quoting Model Penal Code § 2.02(2)(c)).

The *Bullock* standard for defalcation relies heavily on the criminal law definition for recklessness found in the Model Penal Code. *Bullock,* 133 S.Ct. at 1759 ("Thus, we include reckless conduct of the kind set forth in the Model Penal Code."). This contrasts with the tort definitions the Supreme Court has applied to define terms in other subsections of § 523. *See Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (relying on the Restatement (Second) of Torts to define the term "actual fraud" found in § 523(a)(2)). In the case of recklessness, this distinction is important because the criminal and civil definitions of that term differ. The test for criminal recklessness is subjective, while the tort definition is objective. *Farmer v. Brennan,* 511 U.S. 825, 836–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Under the civil definition, it is enough to show that the actor *should have known* of risk of harm his actions created. *Id.* For example, the Restatement (Second) of Torts' definition applies a reasonable person standard—an act is reckless if the actor has reason to know of facts which would lead a reasonable person to realize that the conduct creates an unreasonable risk of harm. Restatement (Second) of Torts § 500. In criminal law, liability for reckless conduct depends on a finding that

the defendant "disregards a risk of harm *of which he is aware.*" *Farmer,* 511 B.R. at 836–37 (emphasis added). As explained by the commentary to the Model Penal Code, recklessness "involves conscious risk creation." Model Penal Code and Commentaries § 20.02 cmt. 3, at 234. Recklessness "resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than substantial certainty; the matter is contingent from the actor's point of view." *Id.* A jury's assessment of criminal recklessness is always made "from the *point of view of the actor's perceptions,* i.e., to what extent he was aware of risk, of factors relating to its substantiality and of factors relating to its unjustifiability." *Id.* at 238.

In the criminal context, the risk involved is often physical harm to another. *E.g., People v. Hall,* 999 P.2d 207, 222–24 (Colo.2000) (considering whether the defendant's conduct created a substantial and unjustifiable risk of death for charge of reckless manslaughter). When the Supreme Court incorporated the criminal standard into the defalcation context, it specified that the risk involved is that the debtor's conduct "will turn out to violate a fiduciary duty." *Bullock,* 133 S.Ct. at 1759. Thus, to meet *Bullock* 's recklessness standard, there must be evidence that the debtor was subjectively aware that his conduct might violate a fiduciary duty. It is not enough that the debtor objectively *should have been* aware of the risk—such a finding would only support a finding of criminal negligence, not recklessness. *Hall,* 999 P.2d at 219–20 ("An actor is criminally negligent when he should have been aware of the risk but was not, while recklessness requires that the defendant actually be aware of the risk but disregard it."); Model Penal Code and Commentaries § 2.02 cmt. 3, at 241 (noting that, in

contrast to recklessness, where the fact finder assesses "what the actor's perceptions actually were," a negligence determination is made "in terms of an objective view of the situation as it actually existed"). Indeed, the *Bullock* decision specifically overruled the "objective recklessness" standard that the lower court had applied and remanded for application of the new heightened standard.[2] *Bullock*, 133 S.Ct. at 1761.

■■■ This heightened, subjective standard supplants the prior quasi-strict liability for defalcation imposed by courts interpreting the Construction Trust Fund Statute. Pre-*Bullock* cases considered a debtor's subjective intent to breach a fiduciary duty to be "irrelevant." *Antlers Roof–Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 287 (10th Cir. BAP 1997). A debtor's lack of knowledge of the Construction Trust Fund Statute's fiduciary requirements was not a defense. *Id.* ("Courts also agree that fiduciaries are charged with knowledge of their duties and of applicable law."); *see also People v. Mendro*, 731 P.2d 704, (Colo.1987) ("The defendant's violation of [Colo.Rev.Stat.] section 38–22–127 is not immune from prosecution because of his ignorance of that statute's existence."). In the post-*Bullock* context, simply imputing knowledge of a statutory fiduciary duty will not suffice to establish recklessness. *See* Jonathon S. Byington, *The Challenges of the New Defalcation Standard*, 88 Am. Bankr. L.J. 3, 31 (2014) ("Even where constructive knowledge of fiduciary duties is im-

posed, Bullock's new standard requiring the debtor have subjective awareness of the risk changes the law and would preclude the imposition of constructive knowledge of fiduciary duties (because that would result in an objective 'should have known' standard)."). A debtor cannot *consciously* disregard a risk of violating a fiduciary duty if he or she is wholly unaware of that duty. There must be some evidence that the debtor was aware of the fiduciary duty and of the risk that his conduct would violate that duty. This is not to say a debtor must admit to being aware of a fiduciary duty. Conscious disregard, like other intent elements, may be inferred from the particular facts of the case. *Hall*, 999 P.2d at 220 ("A court or trier of fact may infer a person's subjective awareness of a risk from the particular facts of a case, including the person's particular knowledge or expertise.").

■■■ In addition to conscious disregard of a risk, the *Bullock* decision held that defalcation occurs where a debtor is "willfully blind" to a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. *Bullock*, 133 S.Ct. at 1759. Willful blindness is another term imported from criminal law. The term is not included in the Model Penal Code's definition of recklessness. Rather, the commentary to the Model Penal Code explains that "willful blindness" is a method of establishing the *mens rea* of knowledge. Section 2.02(7) of the Model Penal Code provides that "knowledge is established if a person is aware of a high proba-

---

**2.** Both the Eleventh and Sixth Circuits previously applied an "objective recklessness" standard to defalcation under § 523(a)(4). *Bullock v. BankChampaign, N.A. (In re Bullock)*, 670 F.3d 1160, 1166 (11th Cir.2012), *rev'd,* —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013); *Patel v. Shamrock Floorcovering Serv., Inc. (In re Patel)*, 565 F.3d 963 (6th Cir.2009). In the construction trust fund

context, the Sixth Circuit described objective recklessness as "when the evidence supports the objective fact that monies paid into the building contract fund were used for purposes other than to pay laborers, subcontractors or materialmen first ... so long as the use was not the result of mere negligence or a mistake of fact." *Patel*, 656 F.3d at 970 (internal citation omitted).

bility of its existence, unless he actually believes that it does not exist." Model Penal Code § 2.02(7). The commentary explains that this section "deals with the situation that British commentators have denominated 'wilful blindness' or 'connivance,' the case of the actor who is aware of the probable existence of a material fact but does not determine whether it exists or does not exist." Model Penal Code and Commentaries § 2.02 cmt. 9, at 248. The Supreme Court has established a two-part test for willful blindness: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global–Tech Appliances, Inc. v. SEB S.A.*, —— U.S. ——, 131 S.Ct. 2060, 2070, 179 L.Ed.2d 1167 (2011). The scope of willful blindness actually surpasses that of recklessness, because a "willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts" whereas a reckless defendant "is one who merely knows of a substantial and unjustified risk of such wrongdoing." *Id.* at 2070–71.

■■■ Assuming there is either conscious disregard or willful blindness to a risk of violating a fiduciary duty, there must also be evidence that the risk disregarded was "substantial" and "unjustifiable" to establish a § 523(a)(4) claim. These attributes are more objective in nature and depend on an assessment of the surrounding circumstances and the nature and purpose of the defendant's conduct. Model Penal Code and Commentaries § 20.02 cmt. 3, at 237–38. As one court put it, "[w]hether a risk is substantial must be determined by assessing both the likelihood that harm will occur and the magnitude of the harm should it occur. . . .

[W]hether a risk is unjustifiable must be determined by assessing the nature and purpose of the actor's conduct relative to how substantial the risk is." *People v. Hall*, 999 P.2d 207, 218 (Colo.2000). In addition, a fact finder must assess whether the defendant's disregard was a "gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Bullock*, 133 S.Ct. at 1759. This is essentially an objective "value judgment" by the fact finder as to whether the defendant's conduct "justifies condemnation." Model Penal Code and Commentaries § 20.02 cmt. 3, at 237.

## 2. Debtor's Conduct

■■■ In this case, Debtor testified that, during the relevant timeframe, he had no actual knowledge of his duties under the Construction Trust Fund Statute or that he was violating those duties by using revenue from the Jobs to pay unrelated expenses. Debtor testified that his only intent in redirecting customer revenues was to pay off his oldest bills first and that he believed that PRI would be able to pay off MacArthur's bills in time. The evidence demonstrates that PRI was struggling financially and had a backlog of payables. Debtor invested a substantial amount of his own funds to try and keep PRI afloat. There was no evidence that Debtor was squandering revenues PRI earned or using them to pay his personal expenses. Debtor kept competent records of income and expenses and knew which bills remained outstanding on each Job. Debtor had a plan to, and was making efforts to pay off PRI's bills.

MacArthur points out that Debtor has extensive experience in the roofing industry and testified to participating in several trade associations and committees, and to attending numerous industry-related trainings. He also wrote training curriculum

for trade organizations, was a certified roof inspector and served on state licensing and building code committees. Based on this experience, MacArthur argues Debtor should have been aware of the risk. However, as discussed above, the focus of the recklessness standard is subjective; it is not an objective "should have known" standard. In this instance, there is no indication that any of Debtor's training or experience directly related to the Construction Trust Fund Statute or that it made Debtor aware of his fiduciary duties under that statute. In fact, Debtor credibly testified to the contrary—that none of his professional education had addressed fiduciary duties under the statute. He also expressed the opinion, based on his professional training and experience, that most roofing contractors are unaware of the fiduciary obligations imposed by the Construction Trust Fund Statute. Although "conscious disregard" may be inferred from the circumstances, the Court is not convinced that Debtor's training and industry experience in this case are sufficient to support such an inference.

Even if Debtor's training did not make him aware of his fiduciary duties, MacArthur argues a lawsuit filed by another roofing supplier did. On August 5, 2011, approximately three months after PRI started to buy materials from MacArthur, Debtor and PRI were sued by American Roofing Supply, Inc. for violations of the Construction Trust Fund Statute. The Debtor testified that, even in the face of being served with a complaint accusing him of violating his fiduciary duties under the statute, he remained "unaware of the details" of the claim and his fiduciary duties for another year. The Court does not find this testimony to be credible. Debtor did not ignore the lawsuit. He hired counsel and filed an answer after attempting for several months to negotiate a settlement. At the very least, the complaint gave Debtor an awareness that there was a high probability he owed fiduciary duties to material suppliers under the statute. To the extent Debtor chose not to read the details of the complaint, such conduct amounts to taking a "deliberate action" to avoid learning of his duties under the Construction Trust Fund Statute. Based on these circumstances, the Court finds that by August 5, 2011, Debtor was either willfully blind to or consciously disregarded a risk that his handling of trust funds received on the Jobs would violate a fiduciary duty under the Construction Trust Fund Statute.

The Court also finds that the risk was substantial and unjustifiable. Given PRI's financial condition and backlog of payables, Debtor's decision to pay oldest bills first made it highly likely, if not a forgone conclusion, that the trust funds received on the Jobs would be misdirected and not paid to MacArthur. The Court also finds that the risk was unjustifiable. In the criminal context, whether a risk is justified depends on the interest advanced by incurring the risk. For example, if a surgeon performs an operation that has a high risk of killing the patient, but the patient will certainly die without the operation, then the risk is justified. *See* Model Penal Code and Commentaries § 20.02 cmt. 3, at 237. Translating this standard into the defalcation context, the risk could be justified if there were some possible interest or benefit to the trust beneficiary (i.e. the patient in the above scenario) that outweighed the risk of the misuse of trust funds. Here, Debtor testified that his purpose in misdirecting funds was to improve PRI's financial condition, not MacArthur's. Such a self-serving interest cannot justify a risk of harm to MacArthur, the trust beneficiary.

The Court must also determine if the risk was of such a "nature and degree that,

considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Bullock,* 133 S.Ct. at 1761. The Supreme Court gave little guidance as to what constitutes a "gross deviation." In the criminal context, a gross deviation is one that justifies criminal sanctions as opposed to the type of deviation that results in mere civil liability. *See People v. Hall,* 999 P.2d 207, 219 (Colo.2000). Such a standard does not fit easily into the § 523(a)(4) context, since defalcation by a fiduciary is typically a civil claim. Moreover, it is unclear to what standard of conduct courts are to compare the debtor's conduct. Is a "law-abiding person" one that fully complies with his or her fiduciary duties? In the face of such ambiguity, the Court turns to the commentary to the Model Penal Code for guidance, which explains that a factfinder's analysis must focus on the defendant's perceptions and, given those perceptions, make a value judgment as to whether the defendant's conduct deserves to be sanctioned. In this case, Debtor gained awareness of his duties under the Construction Trust Fund Statute when he was sued in August 2011. He was also aware of PRI's financial situation and the high likelihood that his method of paying oldest bills first would cause trust funds to be spent on unrelated expenses. Nevertheless, he continued for several months to misdirect trust funds, leaving numerous MacArthur invoices unpaid. The Court concludes this amounts to a gross deviation from the standard of conduct that a law-abiding contractor would follow.

Plaintiff has therefore established defalcation under the *Bullock* standard, but only as to Debtor's conduct *after* August 5, 2011. Because § 523(a)(4) makes nondischargeable only those debts which result from defalcation while acting in a fiduciary capacity, some attempt must be made to apportion Plaintiff's damages. An exact trace of the trust funds PRI received is impossible given that PRI did not maintain separate bank accounts for each Job. Rather, Debtor testified that revenues received on the Jobs were deposited in PRI's general business account and bills were paid out of that same account.[3] PRI did maintain separate records for each Job, in the form of Job Cost Details. The Job Cost Detail lists each payment PRI received from a customer on a particular Job, that date of payment and the amount. A review of this detailed payment information shows that PRI received trust funds on the Jobs from June 16, 2011 through February 3, 2012. Ex. B. Although it is impossible to determine the exact date that any particular trust funds were misdirected, it is possible to calculate that approximately 60% of those trust funds were received from PRI customers after August 5, 2011. Because the defalcation occurred when Debtor failed to use those trust funds to pay MacArthur's invoices, the Court will apportion damages based on the same percentage. The unpaid balance on MacArthur's invoices is $79,625.94. Sixty percent of that amount is $47,775.56. The Court therefore concludes that $47,775.56 of the debt owed to MacArthur is nondischargeable under § 523(a)(4).

### 3. Treble Damages

In addition to actual damages, Plaintiff seeks treble damages and prejudgment in-

---

**3.** This is in accordance with the Construction Trust Fund Statute, which provides that a contractor must maintain separate records of account for each project or contract but "need not deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section." Colo.Rev.Stat. § 38–22–127(4).

terest as part of its nondischargeable debt. The Supreme Court has held that an award of treble damages may be included in a nondischargeable debt under § 523(a). *Cohen v. de la Cruz*, 523 U.S. 213, 218–19, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). In the *Cohen* case, the lower court had found that the debtor committed actual fraud within the meaning of § 523(a)(2)(A) and that his conduct amounted to an unconscionable commercial practice under a state consumer fraud act, justifying the award of treble damages under that statute. The Supreme Court held that once it is established that specific money or property has been obtained by fraud, then "any debt" arising therefrom is excepted from discharge. As noted by the Court, "[t]he most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting 'money, property, services, or ... credit' that the debtor has fraudulently obtained, including treble damages assessed on account of the fraud." *Id.* at 218, 118 S.Ct. 1212.

Courts have applied this reasoning to other subsections of § 523(a) and concluded that "the status of ancillary obligations such as attorney's fees and interest" are determined by the nondischargeable nature of "the primary debt," and that therefore fees, costs and interest are ancillary to the nondischargeable debt and are also nondischargeable. *See In re Gober*, 100 F.3d 1195, 1208 (5th Cir.1996); *In re Larson*, 862 F.2d 112, 119 (7th Cir.1988). Under this reasoning, once a debt has been determined to be nondischargeable under § 523(a)(4), all of the ancillary obligations which are a part of that debt, including treble damages and interest, are also nondischargeable. *See Cohen*, 523 U.S. at 218–21, 118 S.Ct. 1212; *Colemichael Invs., LLC v. Burke (In re Burke)*, 405 B.R. 626, 652 (Bankr.N.D.Ill.2009) (finding state court award of postjudgment interest to be

nondischargeable under § 523(a)(4)), *aff'd*, 436 B.R. 53 (N.D.Ill.2010).

An award of treble damages is indirectly permitted under the Construction Trust Fund Statute, which provides that "[a]ny person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18–4–401, C.R.S." Colo.Rev.Stat. § 38–22–127(5). The Colorado Supreme Court has held that evidence of a violation of Construction Trust Fund Statute by itself does not lead to criminal liability under Colo.Rev.Stat. § 18–4–401. Instead, the prosecution must prove all of the elements of the theft statute to obtain a criminal conviction, including the requisite element of intent. *People v. Mendro*, 731 P.2d 704, 706–07 (Colo.1987). Once criminal theft has been established, Colorado law provides that the owner of stolen property may recover actual and treble damages. Colo.Rev.Stat. § 18–4–405.

The Colorado theft statute sets for the following elements of criminal theft:

(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; or receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;

(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person; or

(e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.

Colo.Rev.Stat. § 18–4–401. Colorado courts have interpreted the phrase "knowing use" in subsection (b) broadly to cover any situation in which "the offender knowingly obtains control over the property of another without authorization and, even though not intending to deprive the other person permanently of the use or benefit of the property, nonetheless knowingly uses the property in such manner as to deprive the other person permanently of the use or benefit of the property." *People v. Anderson*, 773 P.2d 542, 545 (Colo. 1989).

■ In the context of the Construction Trust Fund Statute, Colorado courts have held that the "knowing use" element can be satisfied if "the offender [is] aware that his manner of using the trust funds is practically certain to result in depriving another person of the use or benefit of the funds." *Id.* A plaintiff need not prove that the offender had "a conscious objective to deprive another person of the use or benefit of the construction trust funds." *Id.* Instead, the question is whether the defendant's actions made it practically certain that the plaintiff would be deprived of the use of the trust funds, an identifiable *res*. *ASCI Readi–Mix & Asphalt Specialties, Co., Inc. v. Gamboa (In re Gamboa)*, 400 B.R. 784, 794–95 (Bankr.D.Colo.2008). Furthermore, the defendant need not even be aware of his or her duties under the Construction Trust Fund Statute to be convicted of theft. *People v. Mendro*, 731 P.2d 704, (Colo.1987). Thus, even if a defendant-contractor has no knowledge of

the obligations imposed by the statute and intended to pay a supplier's bills with other funds, these facts would not prevent imposition of treble damages so long as there was proof the defendant deposited trust funds in his own bank account and then spent those particular funds on unrelated expenses rather than transmitting them to the supplier. *E.g., People v. Anderson*, 773 P.2d at 545 (finding probable cause that the defendant committed theft when he used trust funds to pay unrelated bills with knowledge of unpaid invoices and liens held by suppliers); *Weize Co., LLC v. Colo. Reg'l Constr., Inc.*, 251 P.3d 489, 495–96 (Colo.App.2010) (affirming treble damage award where there was evidence defendant used trust funds on unrelated expenses when it knew of the plaintiff's mechanic liens).

■ This relatively low intent standard for imposition of treble damages seems at odds with the much higher scienter requirement for defalcation established in *Bullock*. The financial consequences of a nondischargeable treble damage award are significant and would seem to mandate a higher standard of culpability. *See Bullock v. BankChampaign*, —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013) (noting that nondischargeability provisions are typically limited to circumstances where "strong, special policy considerations, such as the presence of fault, argue for preserving the debt."). However, the Court is bound by state law on this issue. While federal law controls the issue of nondischargeability, a determination of the existence and amount of the underlying debt is controlled by state law or other relevant non-bankruptcy law. *Grogan v. Garner*, 498 U.S. 279, 283, 284 n. 9, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Cohen v. de la Cruz*, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (applying state law to determine total amount of nondischarge-

able claim, including punitive damages). Because, under Colorado law, a debt for violation of the Construction Trust Fund includes treble damages where criminal theft has been established as outlined above, those damages may be included within the nondischargeable debt owed by Debtor. *Cohen*, 523 U.S. at 219–20, 118 S.Ct. 1212 (holding that the phrase "debt for" in § 523(a) does not impose a "restitutionary ceiling" on the extent to which a debtor's liability is nondischargeable).

 Here there is sufficient evidence that Debtor "knowingly used" trust funds in a manner that was certain to deprive MacArthur of those trust funds. Debtor admits to depositing trust funds into PRI's general business account and using them to pay the oldest bills first. His knowing use of trust funds he received on Jobs to pay unrelated bills rather than to pay MacArthur amounts to theft under Colo.Rev. Stat. § 18–4–401(b). Accordingly, MacArthur is entitled to treble damages.

### 4. Prejudgment Interest

 MacArthur also seeks an award of prejudgment interest. As discussed above, prejudgment interest may be included in a nondischargeable debt. *See Cohen v. de la Cruz*, 523 U.S. 213, 218–19, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). Although there is some dispute in the case law, it appears that most courts apply federal law in determining a party's right to prejudgment interest. *See Diamond v. Bakay (In re Bakay)*, 454 Fed.Appx. 652, 654 (10th Cir.2011) (unpublished) (applying federal law in nondischargeability case); *Lapin v. Glatstian (In re Glatstain)*, 215 B.R. 495, 498 (Bankr.D.N.J.1997) (same); *Sunclipse, Inc. v. Butcher (In re Butcher)*, 200 B.R. 675, 680 (Bankr.C.D.Calif.1996) (same). *But see Pritchard Concrete, Inc. v. Barnes (In re Barnes)*, 377 B.R. 289, 299 (Bankr.D.Colo.2007) (applying state

law). Under federal law, prejudgment interest may generally be awarded if "1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable." *In re Bakay*, 454 Fed. Appx. at 654 (citing *In re Inv. Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993)). "Thus under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Id.* (citing *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir.1988)). However, prejudgment interest is not recoverable as a matter of right but is instead governed by considerations of fundamental fairness. *Id.* The decision to award prejudgment interest is a matter left to the sound discretion of the trial court. *In re Butcher*, 200 B.R. at 680.

 In this case, there does not appear to be any equitable reason or justification for withholding prejudgment interest. Such an award will compensate MacArthur for PRI's misuse of its trust funds. *See In re Glatstian*, 215 B.R. at 497 (awarding prejudgment interest in § 523(a)(4) breach of fiduciary duty case). Interest begins to accrue when the defalcations occurred. *Id.* at 498. MacArthur asserts the correct interest rate is the rate provided for in the parties' contract, which is prime plus 3%. However, since the matter is governed by federal law, many courts appear to apply the federal rate of interest found at 28 U.S.C. § 1961 for both prejudgment and postjudgment interest awards in nondischargeability actions. *Id.* at 498; *Keeton v. Flanagan (In re Flanagan)*, 2014 WL 764371, at *9 (9th Cir. BAP Feb. 26, 2014); *Urological Group, Ltd. v. Peterson (In re Petersen)*, 296 B.R. 766, 788 (Bankr. C.D.Ill.2003). That rate is linked to the interest rate used for short-term United States Treasury bills.

The parties have not addressed this authority, nor the proper calculation of prejudgment interest. Accordingly, the Court will set a deadline below for the parties to submit a proposed calculation of prejudgment interest along with authority to support that calculation. The parties should also address whether an award of attorney's fees and costs is permitted under the Colorado criminal theft statute. *See* Colo. Rev.Stat. § 18–4–405 (allowing the victim of theft to recover "recover costs of the action and reasonable attorney fees").

### B. Larceny and Embezzlement

Section 523(a)(4) also makes debts for larceny and embezzlement nondischargeable. MacArthur's complaint in this proceeding did not specifically allege either larceny or embezzlement. However, the Court asked that parties to address the potential applicability of these claims in their written closing arguments. Because the Court has found only a portion of MacArthur's debt to be nondischargeable under the defalcation portion of § 523(a)(4), it is necessary to determine whether the remaining debt might be nondischargeable under either a larceny or embezzlement claim.

■ Nondischargeability under § 523(a)(4) may rest on proof of embezzlement or larceny without requiring proof of a fiduciary relationship. *See Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir.1988). Both claims have similar elements. The main difference between larceny and embezzlement is that with embezzlement, the debtor initially acquires the property lawfully, whereas larceny requires that the funds originally come into the debtor's hands unlawfully. *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr.D.Colo. 2004). In this case, the only potentially applicable claim is embezzlement, since

PRI acquired the trust funds at issue legally when it received payments from its customers.

MacArthur argues that, if reckless disregard is established for defalcation, then the intent necessary for embezzlement is also established. As discussed above, however, MacArthur failed to establish that Debtor acted with reckless disregard prior to August 2011. Furthermore, the defalcation standard described in *Bullock* is uniquely focused on a debtor's conscious disregard of a risk that his conduct will violate a fiduciary duty. Focus on fiduciary duties is not a prerequisite of an embezzlement claim. As such, a finding of defalcation does not necessarily support a finding of embezzlement. *See Bullock v. BankChampaign*, —— U.S. ——, 133 S.Ct. 1754, 1760–61, 185 L.Ed.2d 922 (2013) (noting the differences between defalcation, embezzlement and larceny).

MacArthur also cites to numerous cases construing the Colorado criminal theft statute in support of an embezzlement claim. These cases primarily deal with the "knowing use" standard under Colo.Rev. Stat. § 18–4–401(1)(b), in the context of a violation of the Construction Trust Fund Statute. As discussed more fully above, Colorado courts have interpreted "knowing use" broadly such that a defendant-contractor can be held liable for theft of construction trust funds even without proof an intent to permanently deprive another of those funds. *People v. Anderson*, 773 P.2d 542, 545 (Colo.1989). While these cases may control the award of punitive damages under the Colorado theft statute, they are not controlling in terms of the element of intent necessary to establish embezzlement under § 523(a)(4). That is a matter of federal law governed by the terms of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

This Court has previously held that the intent requirement for embezzlement under § 523(a)(4) is *"animus furandi"* or intention to steal. *Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321 (Bankr.D.Colo.2013). Although sometimes referred to as "fraudulent intent," proof of a fraudulent misrepresentation is not required. Rather, there must be proof of an "intent to permanently deprive." *Id.* at 327 (citing 3 Charles E. Torcia, Wharton's Criminal Law § 385 (15th ed.1993)). The Supreme Court reiterated the heightened intent requirement for embezzlement in *Bullock*, when it described embezzlement as requiring "wrongful intent" and relied on authorities that describe embezzlement as involving "moral turpitude or intentional wrong" and an "intent to deprive." *Bullock*, 133 S.Ct. at 1760.

In this case, the Court finds that MacArthur failed to establish that Debtor's use of the trust funds was accompanied by an intent to permanently deprive. Debtor credibly testified that, at least prior to August 5, 2011, he had no idea that the income he received on the Jobs amounted to trust funds to which MacArthur was entitled. Debtor stated that his intent in using the funds was simply to pay off the oldest bills first and that he fully intended to pay MacArthur at a later date. Debtor kept careful records of what was still due and owing to MacArthur and in fact made numerous payments to MacArthur during the time period in question. Ex. C. Although Debtor's lack of awareness of the Construction Trust Fund Statute does not immunize him from liability for theft under Colorado law, *see People v. Mendro*, 731 P.2d 704, 707 (Colo.1987), it does undercut a finding of intent to steal in connection with an embezzlement claim under § 523(a)(4).

Embezzlement is a crime that builds on the concept of conversion. Conversion is simply an act or control over the property of another that seriously interferes with the owner's rights. *United States v. Stockton*, 788 F.2d 210, 217 (4th Cir.1986). The mental state required for conversion is merely a specific intent to appropriate the property. *Id.* Knowledge that the property belongs to another is not necessary. *Morissette v. United States*, 342 U.S. 246, 270, 72 S.Ct. 240, 96 L.Ed. 288 (1952). For this reason, conversion, without more, is generally a civil tort, but is not a crime. *Id.* (noting that a defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant for purposes of the tort of conversion). For embezzlement, however, there must be knowledge that the appropriation is contrary to the wishes of the owner. *Stockton*, 788 F.2d at 217; 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.6(f)(1) (2d ed. 2012) ("One who converts the property of another which is in his lawful possession is not guilty of embezzlement (for his conversion is not fraudulent) if, when he converts, he honestly believes the property is his own or is nobody's, or he otherwise honestly believes he is authorized to convert it."). "A defendant who exercises dominion over property in the good-faith belief that the property is his own, or that the appropriation is otherwise authorized, is not guilty of embezzlement." *Id.* Thus, if Debtor did not know that the funds at issue belonged to MacArthur in the first instance, there is no basis to conclude that he intended to steal them from MacArthur. After all, these were revenues PRI received from its own customers, revenues which were not explicitly earmarked for certain expenses. It was not unreasonable for Debtor to believe the funds belonged to PRI. If Debtor honestly (albeit mistakenly) believed PRI was entitled full use of the funds, there is no embezzlement. Accord-

ingly, the Court concludes that MacArthur has failed to establish the necessary elements of an embezzlement under § 523(a)(4) as it relates to Debtor's conduct prior to August 5, 2011.

## III. CONCLUSION

For the reasons stated above, the Court concludes that MacArthur demonstrated all elements of its claim for defalcation while acting in a fiduciary capacity under § 523(a)(4) as it relates to 60% or $47,775.56 of the debt owed to it. MacArthur has also established its right to recover treble damages under Colo.Rev.Stat. § 18–4–403 and that such damages are also nondischargeable under § 523(a)(4), bringing the total nondischargeable claim up to $143,326.68 ($47,775.56 × 3), plus pre- and post-judgment interest. The Court denies any claim for embezzlement and larceny under § 523(a)(4).

In order to assist the Court in making the correct calculation of interest, MacArthur shall, on or before **Friday, August 1, 2014**, file a calculation of prejudgment interest with a description of its calculation, and supporting legal authority. In the same pleading, MacArthur shall present authority for its entitlement to attorney's fees and costs under Colo.Rev.Stat. § 18–4–405, and provide affidavit of those fees and costs along with detailed time records. Debtor shall file a response on or before **Friday, August 15, 2014**. The Court will not enter a final judgment until it has ruled on interest and fees.