FILED

ORDERED PUBLISHED

APR 15 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP Nos.  NV-14-1468-DJuKu |
| | ) | NV-14-1469-DJuKu |
| TONYA CAROL HEERS, | ) | (Related Appeals) |
| | ) | |
| Debtor. | ) | Bk. No.  2:13-bk-19887-LED |
| _____ | ) | |
| | ) | Adv. Nos. 2:14-ap-01029-LED |
| TONYA CAROL HEERS, | ) | 2:14-ap-01030-LED |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| DARRELL PARSONS, JR.; AMERICAN | ) | |
| CONTRACTORS INDEMNITY COMPANY, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on March 19, 2015
at Las Vegas, Nevada

Filed - April 15, 2015

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Laurel E. Davis, Bankruptcy Judge, Presiding

_____

Appearances:     William L. McGimsey argued for appellant Tonya
Carol Heers; Abran E. Vigil of Ballard Spahr LLP
argued for appellee Darrell Parsons, Jr.; Misty
Perry Isaacson of Pagter and Perry Isaacson,
APLC, argued for appellee American Contractors
Indemnity Company.

_____

Before:  DUNN, JURY and KURTZ, Bankruptcy Judges.

Opinion by Judge Dunn
Dissent by Judge Kurtz

DUNN, Bankruptcy Judge:

Debtor defendant appellant Tonya Carol Heers ("Debtor") appeals summary judgment orders in two separate adversary proceedings excepting debts from her discharge under § 523(a)(4)[1] for defalcations while acting in a fiduciary capacity. We AFFIRM.

## I. FACTUAL BACKGROUND

The facts in these two related appeals are not in dispute. Darrell Parsons, Jr. ("Parsons"), was the sole heir of his father, Darrell Parsons, Sr., who died intestate on November 1, 2008. Parsons' father's estate ("Estate") initially was estimated to be worth approximately $3 million[2] and included real estate in California and North Carolina; a business which leased coin-operated lockers to corporate customers throughout the United States; and bank accounts into which cash proceeds from the business were deposited.

When his father died, Parsons had to choose an administrator for the Estate. Parsons learned of his father's death from Thomas Warden ("Warden"), a friend and attorney for his father. Warden handled a number of legal matters for Parsons' father, and on several occasions, Warden had drafted

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2]Ultimately, the gross Estate value was determined to be $5,087,791.

testamentary documents for Parsons' father, none of which were executed. Warden advised Parsons that a probate proceeding would need to be filed in California, and he volunteered to serve as administrator and to refer the matter to a competent probate attorney.

Parsons apparently was upset with Warden because he was not notified of his father's death until after the burial and was unwilling to designate Warden to administer the Estate. Parsons discussed the situation with the Debtor, who was a criminal defense attorney who had handled traffic ticket matters for Parsons. Debtor indicated that she was inexperienced in probate matters, but she expressed interest in administering the Estate. She told Parsons that her mother and law partner was a "probate wizard," and she advised Parsons that she could handle the Estate matter for less than Warden.

Debtor in fact did not have any knowledge of probate law, and prior to her involvement with the Estate, she had never been involved in the administration of a decedent's estate. She likewise had never been involved in any estate planning. Nevertheless, Parsons asked Debtor to administer the Estate, and she accepted. On or about February 6, 2009, Debtor was appointed as administrator of the Estate by the Los Angeles County, California Superior Court ("Probate Court"). She was issued general letters of administration on February 27, 2009. On that same date, Debtor signed and filed with the Probate Court a statement acknowledging her "Duties and Liabilities of Personal Representative" ("Duties Statement"), which stated, among other things, that "[w]ithin four months after Letters [of

-3-

administration] are first issued to you as personal representative, you must file with the court an inventory and appraisal of all the assets in the estate." Upon her appointment as Estate administrator, Debtor became a fiduciary to the Estate.

In December 2008, Debtor had met with Parsons and Warden, at which time Warden delivered to Debtor a Bekins box of records including bank statements, notes and records showing bank accounts and other information with respect to the decedent's assets. In addition, by that time, Warden had completed an inventory of assets in Parsons' father's home.

The Debtor was bonded by American Contractors Indemnity Company ("ACIC"). Thereafter, probate and estate administration proceeded, but neither efficiently nor smoothly.

Debtor understood that her duties in administering the Estate included the preparation and timely filing of tax returns, including the estate tax return, and payment of any taxes owed on behalf of the Estate, so long as the Estate had funds available to pay the taxes. To assist her in performing these duties, Debtor selected an accounting firm headed by D.K. Wallin, a former controller for the state of Nevada (the "Wallin Firm"). The Wallin Firm was licensed in both California and Nevada.

Debtor met with the Wallin Firm in February 2009, but she was not presented with an engagement letter and did not sign a contract of any kind at that time. An engagement letter eventually was presented to her in October 2009. Lorrie Edelblute ("Edelblute") was the Wallin Firm employee who was

assigned to the Estate matter.

Despite her knowledge of her non-delegable duty to do so, Debtor took no steps on her own to ascertain when the estate tax return for the Estate was due, which was no later than August 3, 2009 - nine months following the decedent's date of death. According to Debtor, she was advised by Edelblute that the estate tax return was due by August 15, 2009. However, in subsequent proceedings before the Probate Court, Edelblute was never called to testify in support of Debtor's contentions. On August 11, 2009, Debtor signed and filed with the Internal Revenue Service ("IRS") a Form 4768 request for extension of the Form 706 estate tax return deadline, which included an estimated estate tax due of $825,000, as calculated by the Wallin Firm, and further specifically referenced the past due deadline for the estate tax return filing as August 3, 2009. With the Form 4768 extention request, Debtor included a tax payment of $10,000 because she thought she had only a total of $20,000 available in the Estate bank account to which she had access.

Debtor eventually hired another accounting firm, Gamut and King, to assist her with her Estate work. In April 2010, Debtor received a notice from the IRS that they had not received the estate tax return for the Estate. Debtor then paid an additional $16,000 to the IRS, in spite of the estimate from the Wallin Firm that the estate tax would actually be approximately $825,000. Apparently, the estate tax return for the Estate was finally filed on September 15, 2010. Debtor eventually sent additional payments totaling approximately $1,300,000 to the IRS on behalf of the Estate, but in November 2010, Debtor received a

-5-

letter from the IRS advising her that the Estate owed an additional $397,000.

Upon inquiry to Gamut and King, Debtor learned that the additional IRS claim represented penalties for failing to file the estate tax return by the August 2009 deadline. Debtor requested Gamut and King to appeal the IRS penalty assessment, but the appeal was rejected. Late payment penalties plus interest ultimately totaled $439,621.61.

Debtor filed her first inventory and appraisal for the Estate in February 2010. A "corrected" inventory was filed on June 22, 2010, and the final accounting also was filed in June 2010.

Debtor filed a Second Account in the probate proceeding on July 11, 2011, to which Parsons objected. Specifically, Parsons requested a finding that Debtor was personally liable for the tax penalties and interest assessed by the IRS against the Estate as a result of breaches by Debtor of her fiduciary duties as administrator, focusing on the late filing of the estate tax return and the late payment of the estate tax owed.

The Probate Court heard Parsons' objection to Debtor's Second Account at a trial on March 25-26, 2012. Following the presentation of testimony and argument and the admission of numerous exhibits, the Probate Court took the matter under advisement and issued a written decision on June 22, 2012 ("Second Account Findings").

The Second Account Findings opened with a time line with respect to the decedent's death and the probate proceedings. The Probate Court described the "most salient and undisputed"

facts of the matter as follows:

> [Debtor] was the general administrator of this [Estate] with the sole responsibility to assure that tax returns were filed and taxes owing were paid. The accounting firm she engaged did not file the estate tax return by the August 3, 2009 deadline. As a result, interest and penalties became due and owing to the IRS in the amount of $439,621.61.

The Probate Court was troubled that although Debtor blamed the Wallin Firm for the missed estate tax deadline, no engagement letter setting forth the respective duties of the parties was signed with the Wallin Firm until October 2009. In addition, although Debtor testified that she was unaware of the missed deadline until she was notified by the IRS, she had signed the Form 4768 extension request on August 11, 2009, which clearly designated the estate tax return deadline as August 3, 2009.

The Probate Court determined that Debtor was dilatory in gathering and organizing Estate asset information, which was "illustrative of [Debtor's] pattern of lethargy when it came to working on this [Estate]." Under California Probate Code § 8800(b), the Estate inventory was due in June 2009, within four months after letters of administration issued, but was not filed until February 2010.

The Probate Court further was mystified by Debtor's failure to pay most if not all of the estate tax liability as soon as she became aware of the due date because the "inventory and appraisals coupled with the accountings filed in this case show that sufficient or close to sufficient monies existed in the cash accounts of Darrell Parsons, Senior to pay almost all, if not all, of the estimate[d] tax." The Probate Court found that

-7-

Debtor's decision to pay $10,000 as a down payment on an estimated $825,000 estate tax liability "makes absolutely no sense."

> The failure to explain why [Debtor] had not marshaled sufficient control over the cash assets in the [Estate] that, if provided to the IRS, would have eliminated or at least, mitigated, the penalties and interest, presents a mystery to this court and substantially supports that [Debtor] breached her duty of care.

Second Account Findings, at 14.

In its order regarding Debtor's Second Account ("Second Account Order"), the Probate Court awarded what it characterized as a surcharge against the Debtor in the amount of the IRS estate tax late filing penalties and interest totaling $439,621.61, plus interest "at the legal rate." However, the Probate Court further ordered that any subsequent award of compensation to the Debtor as Estate administrator would be offset against the surcharge amount and did not award Parsons any attorneys fees. The Second Account Order was not appealed and is final.

In an order entered on November 12, 2013, the Probate Court determined the surcharge judgment ("Surcharge Judgment") to be $347,243.96 as of April 29, 2013, with interest accruing thereon at a rate of $95.13 per day. The Surcharge Judgment, among other things, reflects offsets of $150,000 from a settlement payment ("Bond Payment") by ACIC to Parsons on Debtor's fiduciary bonds and $65,262.07, representing Debtor's statutory commission/compensation as administrator of the Estate. The Surcharge Judgment likewise is final.

Prior to that time, in July 2013, ACIC filed a motion in

-8-

the Probate Court to obtain judgment against Debtor for its Bond Payment. Debtor did not oppose the motion, and on August 21, 2013, the Probate Court entered judgment in favor of ACIC for the Bond Payment and $22,374.30 in attorneys fees, plus interest at 10% ("Bond Judgment"). Debtor did not appeal the Bond Judgment, and it is final.

Debtor filed for relief under chapter 7 on November 26, 2013.[3]

Both Parsons and ACIC filed timely adversary proceedings against Debtor, seeking determinations that the Surcharge Judgment and the Bond Judgment should be excepted from Debtor's discharge under § 523(a)(4) for defalcations by Debtor while acting in a fiduciary capacity. Debtor filed answers to both complaints denying that the subject debts should be excepted from her discharge. Both Parsons and ACIC filed motions for summary judgment in June 2014, supported by documentary evidence and the declarations of one of ACIC's in-house counsel and its trial counsel. The centerpiece supporting both summary judgment motions was the Probate Court's Second Account Findings. Debtor filed memoranda in opposition to both motions for summary judgment, to which Parsons and ACIC replied. Both Parsons and

_____

[3]From the briefs and records filed in these appeals, there is some question as to whether Debtor filed her chapter 7 petition on November 16 or 26, 2013. We have exercised our discretion to take judicial notice of documents filed in Debtor's main bankruptcy case and in the two adversary proceedings from which these appeals arise to resolve this question, among others. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

-9-

ACIC relied primarily on the asserted preclusive effects of the Second Account Findings, coupled respectively with the final Surcharge Judgment and Bond Judgment.

The bankruptcy court heard oral argument ("Hearing") on both summary judgment motions on August 6, 2014. At the Hearing, while all parties unsurprisingly emphasized different aspects of the undisputed facts, the focus of the argument was on the impact of the recent Supreme Court decision in Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013), interpreting application of the "defalcation while acting in a fiduciary capacity" standard in § 523(a)(4) cases. Following argument and colloquy with counsel, the bankruptcy court announced its conclusions orally. Initially, the bankruptcy court noted that Debtor did not dispute the statements of undisputed facts submitted by Parsons and ACIC and had submitted no declarations in opposition. The bankruptcy court further pointed out that the Supreme Court has recognized that bankruptcy courts can apply issue preclusion to the findings of fact and conclusions of law of other courts with respect to the elements of exception to discharge claims. The bankruptcy court also noted that there was no dispute that Debtor was a fiduciary of an express trust for purposes of the plaintiffs' § 523(a)(4) claims. The only issue was whether Debtor had committed a defalcation(s) that would except her debts to Parsons and ACIC from discharge. Citing the Supreme Court's Bullock decision, the bankruptcy court characterized the applicable standard as "conduct that would be deemed reckless, or recklessness to the point of inferring a reckless disregard such as you would have in a

-10-

criminal situation." Hr'g Tr. (Aug. 6, 2014) at 25:5-7. The bankruptcy court then concluded that Debtor's breaches of her fiduciary duties met that standard and granted both summary judgment motions.

Orders granting summary judgment in favor of ACIC and Parsons against Debtor were entered on September 15 and 16, 2014, respectively. The order in favor of Parsons was denominated a "judgment," though it included a grant of the summary judgment motion. The order in favor of ACIC was denominated an "order granting summary judgment . . . ," though it included a statement that the debt was non-dischargeable under § 523(a)(4).[4]

Debtor filed timely appeals from both summary judgment decisions.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C.

---

[4]Each order/judgment might technically be considered to violate the separate judgment rule. See Rule 7058, making Civil Rule 58 applicable in adversary proceedings. "Ordinarily there should be a separate document embodying a final judgment that is distinct from and in addition to an order granting a motion for summary judgment." Gaughan v. Edward Dittlof Revocable Trust (In re Costas), 346 B.R. 198, 200 n.3 (9th Cir. BAP 2006). However, the requirement for a separate judgment may be considered waived by the parties where the bankruptcy court clearly evidenced its intent that an order from which an appeal has been taken represented its final decision in the matter, and the prevailing party does not object to the taking of an appeal in the absence of a separate judgment. Bankers Trust Co. v. Mallis, 435 U.S. 381, 387-88 (1978). These requirements are satisfied in these cases, and the separate judgment requirement is deemed waived to the extent it was not otherwise satisfied by the expiration of the 150-day period in Civil Rule 58(c)(2)(B).

-11-

§ 158.

## III. ISSUE

Whether the bankruptcy court erred in concluding that Debtor's conduct at issue met the standard for defalcation while acting in a fiduciary capacity for purposes of § 523(a)(4).

## IV. STANDARDS FOR REVIEW

We review bankruptcy court summary judgment orders de novo. Shahrestani v. Alazzeh (In re Alazzeh), 509 B.R. 689, 692-93 (9th Cir. BAP 2014); Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 823 (9th Cir. BAP 2006), aff'd, 506 F.3d 956 (9th Cir. 2007). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Civil Rule 56(a); Rule 7056; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

We also review de novo the preclusive effects of state court orders and judgments. Whether issue preclusion is available is a mixed question of law and fact. Stephens v. Bigelow (In re Bigelow), 271 B.R. 178, 183 (9th Cir. BAP 2001); In re Khaligh, 338 B.R. at 823. If issue preclusion is available, the decision of the bankruptcy court to apply it is reviewed for abuse of discretion. Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez), 367 B.R. 99, 103 (9th Cir. BAP 2007). Under the abuse of discretion standard, reversal is appropriate only where the bankruptcy court applied an incorrect legal rule, or where its application of the law to the facts was illogical, implausible or without support from inferences that may be drawn from the record. Ahanchian v. Xenon Pictures,

-12-

Inc., 624 F.3d 1253, 1258 (9th Cir. 2010), citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). When a state's preclusion law controls, the bankruptcy court is required to exercise such discretion consistent with the applicable state law.[5] Gayden v. Nourbakhsh (In re Nourbakhsh), 67 F.3d 798, 800-01 (9th Cir. 1995); In re Khaligh, 338 B.R. at 823.

We can affirm the bankruptcy court on any basis supported by the record. ASARCO, LLC v. Union Pac. R.R., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V. DISCUSSION

The only issue in these appeals is whether Debtor committed a defalcation(s) while acting in a fiduciary capacity that supports excepting her debts to Parsons and ACIC from discharge for purposes of § 523(a)(4).[6] We begin our analysis by noting that we are bound by the principle that "exceptions to discharge should be strictly construed against an objecting creditor and

---

[5] Debtor does not contest or present any argument in either of these appeals that the bankruptcy court misapplied California issue preclusion law. Accordingly, any such argument is deemed waived. "We review only issues which are argued specifically and distinctly in a party's opening brief." Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994), citing Miller v. Fairchild Indus., Inc., 797 F.2d 727, 738 (9th Cir. 1986).

[6] Section 523(a)(4) provides an exception to an individual chapter 7 debtor's discharge for debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." As noted by the bankruptcy court at the Hearing, Debtor does not contest that, considering her conduct that resulted in the subject judgment debts, she was acting as a fiduciary of an express trust.

-13-

in favor of the debtor." Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992); Mele v. Mele (In re Mele), 501 B.R. 357, 363 (9th Cir. BAP 2013).

The battle lines between the parties are drawn based on the Supreme Court's recent decision in Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013). Prior to the Bullock decision, courts, including courts of appeals, had disagreed about the mental state required to support an exception to discharge based on a defalcation of a fiduciary under § 523(a)(4). In fact, in considering interpretation of § 523(a)(4), the Ninth Circuit had held that the term "defalcation" included "even innocent acts of failure to fully account for money received in trust." Sherman v. S.E.C. (In re Sherman), 658 F.3d 1009, 1017 (9th Cir. 2011), quoting Blyler v. Hemmeter (In re Hemmeter), 242 F.3d 1186, 1190 (9th Cir. 2001).

In Bullock, the debtor had served as the trustee of a family trust with a single asset, a life insurance policy on his father's life. Bullock, 133 S. Ct. at 1757. The trust agreement allowed the trustee to borrow against the life insurance policy's value, with any such loans to be repaid at the "insurance company-determined 6% interest rate." Id. The debtor, in fact, took out several such loans, using some of the loan funds for transactions that benefitted him personally. Id. However, all such loans were repaid in full with six percent interest to the trust. Id.

The debtor later was sued by his brothers in Illinois state court ("State Court"), and the State Court ultimately determined that the debtor had breached his fiduciary duty, finding that,

-14-

although the debtor "does not appear to have had a malicious motive in borrowing funds from the trust," he nonetheless "was clearly involved in self-dealing." Id. Accordingly, the State Court entered a judgment against the debtor that he sought to discharge in bankruptcy. Id.

The successor trustee bank ("Bank") filed an adversary proceeding in bankruptcy to except the debtor's judgment debt to the trust from his discharge under § 523(a)(4). Id. As in these appeals, the bankruptcy court granted summary judgment in favor of the Bank, concluding that the debtor's debt to the trust was for defalcation while acting in a fiduciary capacity and thus was excepted from his discharge under § 523(a)(4). Id. at 1758.

The Supreme Court granted certiorari to consider the scope of the term "defalcation" in the § 523(a)(4) context and concluded that it included a "culpable state of mind requirement" to align it with the other claims for discharge exceptions included in § 523(a)(4), i.e., fraud while acting in a fiduciary capacity, embezzlement and larceny. Id. at 1757 and 1760-61. Following Bullock, it is clear that a finding of "defalcation while acting in a fiduciary capacity" does not support an exception to discharge under § 523(a)(4) on a "no fault" or strict liability basis. See id. at 1761.

What is not so clear is where to draw the line in considering fiduciary defalcations that do not involve a subjective intent to cause harm. The expansive language used by the Supreme Court in setting forth new standards leaves us with some difficult problems of interpretation in this case. The

-15-

Supreme Court described the standards for excepting a fiduciary defalcation from a debtor's discharge under § 523(a)(4) as follows in Bullock:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI Model Penal Code § 2.02(2)(c), p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves **a gross deviation** from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added).

Bullock at 1759-60 (emphasis in original).

The quoted language from the Bullock decision, in effect, states three bases for determining that a fiduciary defalcation supports an exception from a debtor's discharge for the subject debt:

First, debts resulting from acts of bad faith, moral turpitude or other immoral conduct are excepted from discharge under the § 523(a)(4) defalcation standard. See Tomasi v. Savannah N. Denoce Trust (In re Tomasi), No. CC-12-1401-KiTaD, 2013 WL 4399229, at *10 (9th Cir. BAP Aug. 15, 2013). In the Surcharge Judgment, the Probate Court awarded Debtor her statutory commission as Estate administrator in the amount of $65,262.07 as an offset against the surcharge award. In

-16-

addition, in his objection to the Debtor's Second Account, Parsons requested attorneys fees and costs under California Probate Code ("Probate Code") § 11003(b). Noting that Probate Code § 11003(b) required a finding that Debtor opposed Parsons' objection "without reasonable cause and in bad faith" to support an award of fees and costs, the Probate Court declined to award Parsons attorneys fees and costs. No party has suggested that Debtor's breaches of her fiduciary duties at issue in these appeals were the products of moral turpitude or other immoral conduct.

Second, the § 523(a)(4) defalcation standard covers intentional improper conduct and criminally reckless conduct. Neither Parsons nor ACIC have claimed either before the bankruptcy court or in these appeals that Debtor intentionally breached her fiduciary duties or acted with criminal intent. If the Supreme Court had stopped after the first two sentences of the above-quoted standards, we would be compelled to reverse the bankruptcy court's summary judgment decisions.

However, the Supreme Court went on to elaborate, in effect, a third iteration of the defalcation standard under § 523(a)(4). Citing the ALI Model Penal Code § 2.02(2)(c), the Supreme Court determined that a fiduciary who breaches a fiduciary duty without actual knowledge of wrongdoing but who consciously disregards or is willfully blind to a substantial and unjustifiable risk is subject to a § 523(a)(4) exception to

-17-

discharge for defalcation.[7] We interpret this third iteration of the defalcation standard as essentially a heightened "recklessness" standard.

Debtor argues that she essentially was held liable for not knowing the due date for the Estate's estate tax return and not filing the estate tax return timely, even though she had retained an accounting firm to prepare the return. She further argues that in these circumstances, excepting her judgment debts to Parsons and ACIC as defalcations for purposes of § 523(a)(4) amounts to a strict liability determination of criminal culpability, contrary to the standards set forth in Bullock.

Parsons and ACIC assert that Debtor knowingly and/or recklessly disregarded her fiduciary obligations in at least three respects: (1) she failed to marshal and file an inventory and appraisal of the Estate's assets so that the estate tax return could be timely filed and the estate tax liability could be timely paid; (2) she failed to file the estate tax return timely, even though it was her ultimate responsibility to file the return and make sure that the deadline was met; and (3) even after the estate tax return deadline had passed, the estate tax

---

[7]ALI Model Penal Code § 2.02(2)(c) states:

Recklessly. A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

-18-

return was not completed and filed until many months after it was due. In spite of having her accounting firm's estimate of the estate tax to be paid, she dribbled in payments over a period of many months, thus exacerbating the penalties assessed and the amount of accrued interest that had to be paid. In these circumstances, Parsons and ACIC both contend that the bankruptcy court's summary judgment determinations were correct that Debtor's judgment debts to them resulting from defalcations of her fiduciary duties were excepted from her discharge pursuant to § 523(a)(4) under Bullock.

Our review of the undisputed facts in the record before us leads us to the following conclusions: Prior to her appointment as Estate administrator, Debtor sought to be retained for substantial Estate work that she was not competent to perform.

We agree with the Probate Court's conclusion that it is inconceivable that a trained attorney who practiced outside the probate area but had agreed to accept a position as the administrator of a substantial California probate estate would not have reviewed the duties of an estate administrator under the Probate Code to ascertain the requirements to file an inventory and appraisal timely. Debtor is not in the category of "**nonprofessional** trustees, perhaps administering small family trusts potentially immersed in intrafamily arguments," for whom the Supreme Court expressed particular concern in Bullock. See Bullock, 133 S. Ct. at 1761 (emphasis in original). In any event, when she signed and filed the Duties Statement with the Probate Court, Debtor was aware that she had four months from the date that letters of administration were issued to her (the

-19-

very same date) to file the Estate inventory and appraisal. Yet, in a patent exhibition of Debtor's "pattern of lethargy when it came to working on" Estate matters, a partial inventory and appraisal for the Estate was not filed until February 2, 2010, over seven months after it was due, and the final inventory and appraisal was not filed until June 2010, four months later.

Debtor's dilatory filing of the inventory and appraisal had two very adverse effects for the Estate. First, the estate tax return could not be prepared and filed in the absence of the inventory and appraisal information. Consequently, Debtor's late filing of the inventory and appraisal effectively guaranteed that the estate tax return would be filed late. Second, Debtor's failure to inventory and appraise the Estate until a date well beyond when the estate tax return was due meant that she was caught flat-footed when she needed access to Estate bank accounts to marshal assets and pay the estate tax, as estimated by her accountants. As pointed out by the Probate Court, Debtor was entitled to access to all Estate bank accounts from the date that she received her letter of administration, February 27, 2009.

As administrator of the Estate, Debtor had the sole responsibility to make sure that the estate tax return was filed on time and the estate tax was paid. Indeed, upon her appointment as Estate administrator, Debtor knew that she bore those responsibilities so long as the Estate had funds available to pay the estate tax. Yet, she testified before the Probate Court that she relied entirely on the Wallin Firm to handle

-20-

estate tax return issues, admitting that she had no expertise in the tax area: "I don't prepare my own taxes.  I never have in my entire life."  Cal. Sup. Ct. Hr'g Tr. (Mar. 26, 2012) at 33:26-28 (Exh. 6, ECF No. 13, adv. no. 2:14-ap-01030).  Debtor further testified that she was advised by Edelblute that the estate tax return was due by August 15, 2009, and she "vehemently" denied that she ever was told that the estate tax return was due on August 3, 2009.  However, she did not present any corroborating testimony from Edelblute, by declaration or otherwise, and Debtor's testimony was undercut by the late Form 4768 request for extension that she signed, which noted the past due deadline for the estate tax return of August 3, 2009.  In any event, one does not need to be an accountant or even an attorney to calculate the deadline to file an estate tax return mandated by 26 U.S.C. § 6075(a), which requires that estate tax returns "shall be filed within 9 months after the date of the decedent's death."  Even if there was some question as to the exact deadline date, no accounting expertise was needed to calendar a date comfortably in advance of the deadline either to make sure that the return could be filed by that date or to request an extension.

The reality was that the deadline was missed, and Debtor made only a nominal $10,000 payment on an estate tax liability that the Wallin Firm estimated would be $825,000.  However, the missed deadline to file the estate tax return and pay the estate tax owed need not have been catastrophic for the Estate if Debtor had diligently worked to get the estate tax return filed and the tax liability paid as soon as possible thereafter.

However, the estate tax return apparently was not filed until September 15, 2010, over thirteen months after the return was due and after the IRS had sent a reminder that the estate tax return had not been filed in April 2010, approximately five months before. Debtor made further estate tax payments starting in April 2010 through September 2010 totaling $1,316,000. However, by that time, it was too late to avoid the imposition of very large penalties and the accrual of substantial interest.

In these circumstances, we simply disagree with Debtor that concluding that she committed a defalcation in breach of her fiduciary duties excepted from her discharge under § 523(a)(4) is imposing strict liability on her for missing an estate tax return deadline of which she was unaware. The records in these appeals reflect a pervasive and unjustified series of breaches of fiduciary duties by Debtor in administering the Estate. The records further reflect that she consciously and recklessly disregarded the substantial risks to the Estate of not filing the estate tax return and paying the estate tax owed timely, or at least as soon after the deadline passed as possible. Debtor was not merely negligent but was grossly negligent in performing her duties as administrator of the Estate. The materiality of the risks Debtor blindly disregarded is fully reflected in the $439,621.61 in interest and penalties ultimately assessed by the IRS for the late filing of the estate tax return and the late payment of the estate taxes owed. We conclude that the bankruptcy court did not err in granting summary judgments in favor of Parsons and ACIC on their § 523(a)(4) adversary proceeding claims based on Debtor's multiple defalcations of her

-22-

fiduciary duties to the Estate.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's summary judgment decisions in both appeals.

Dissent begins on next page.

KURTZ, Bankruptcy Judge, dissenting:

While I appreciate the majority's effort to make sense of Bullock's recklessness standard, I have a different view of that standard. The majority quotes selected portions of Bullock and concludes that, under Bullock, two different levels of recklessness are subsumed within the term "defalcation" as used in § 523(a)(4). According to the majority, the first level of recklessness included consists of criminal recklessness. The majority then suggests that a second level of recklessness is included, which is higher than the objective recklessness standard Bullock explicitly rejected but lower than criminal recklessness.

Unlike the majority, I have trouble reconciling this second, non-criminal level of recklessness with Bullock's statements tying the requisite level of recklessness to criminal law, to the Model Penal Code, and to intentionally wrongful conduct. See, e.g., Bullock, 133 S. Ct. at 1759 ("where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent."). In short, I believe that Bullock identifies only one level of recklessness as falling within the scope of defalcation under § 523(a)(4), and that is a criminal level of recklessness.

In this respect, and in several others, I prefer the

-1-

analysis of <u>Bullock</u>'s recklessness standard set forth in <u>MacArthur Co. v. Cupit (In re Cupit)</u>, 514 B.R. 42 (Bankr. D. Colo. 2014). In my view, <u>In re Cupit</u> correctly identifies <u>Bullock</u>'s standard as being closely connected to the criminal law definition of recklessness. <u>Id.</u> at 50. Furthermore, <u>In re Cupit</u> offers a number of crucial observations regarding the applicable standard, which include the following:

• The applicable recklessness standard is predominantly subjective in nature and, in the first instance, focuses on the debtor's actual awareness of the risk that his or her conduct might turn out to violate his or her fiduciary duties. <u>Id.</u> at 50-51.

• The debtor is not reckless within the meaning of § 523(a)(4) unless he or she consciously disregards or is willfully blind to the risk of violating his or her fiduciary duties. <u>Id.</u> at 51-52.

• Both conscious disregard and willful blindness focus on the subjective state of mind of the debtor – what he or she actually was aware of and actually believed regardless of the objective reasonableness of that awareness or those beliefs. <u>Id.</u>

• If either of the above subjective elements are met, then the court also must find that the risk ignored was both substantial and unjustifiable. Unlike the conscious disregard and willful blindness elements, this element is predominantly objective in nature, and requires the court to assess whether, in disregarding (or blinding himself or herself to) the risk, debtor grossly deviated "from the standard of conduct that a law-abiding person would observe in the actor's situation." <u>Id.</u>

-2-

at 52 (quoting Bullock, 133 S. Ct. at 1760).

In addition to In re Cupit, I also find persuasive Cincinnati Ins. Co. v. Chidester (In re Chidester), 524 B.R. 656, 661-62 (Bankr. W.D. Va. 2015), which followed In re Cupit. In re Chidester further refined Bullock's recklessness standard in order to correctly apply it in the summary judgment context. In re Chidester held that, on summary judgment, it could rule in favor of the plaintiff-creditor on the recklessness issue only if, given the state of the record, no reasonable trier of fact could have found in favor of the debtor: (1) regarding the debtor's subjective awareness of his or her fiduciary duties; (2) regarding the debtor's conscious disregard of (or willful blindness to) the risk that his or her conduct might breach those duties; and (3) regarding his or her subjective awareness of the substantial and unjustified nature of that risk. Id. at 662. In re Chidester's summary judgment standard is consistent with Ninth Circuit precedent. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) ("Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

Given the predominantly subjective nature of Bullock's recklessness standard and its focus on what the debtor actually was aware of and actually believed at the time, I am persuaded that a reasonable trier fact could find in favor of Heers on the recklessness issue. Indeed, when as here the defendant's state of mind is disputed and is properly at issue, I believe summary judgment almost never will be appropriate. Determining a

-3-

party's state of mind typically requires choosing between two or more possible inferences as well as assessing the party's credibility. See, e.g., Wang v. Ke (In re Ke), 2013 WL 4170250, at *13-14 (Bankr. N.D.N.Y. Aug. 14, 2013), aff'd, 2014 WL 4626329 (N.D.N.Y. Sept. 15, 2014); see also Hernandez v. New York, 500 U.S. 352, 364 (1991) (noting that a litigant's state of mind, for purposes of determining intent, largely turns on the court's assessment of the litigant's credibility). Assessing credibility and choosing between two or more possible inferences are tasks that simply cannot be performed properly in the process of ruling on a summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

I agree with the majority that Heers' performance of her duties was quite poor and that the explanations and excuses she offered in the probate proceedings for her conduct were unsatisfactory. I might even go so far as to characterize Heers' conduct as criminally negligent. Nonetheless, based on my view of Bullock's recklessness standard, I cannot transmute even criminal negligence into a summary judgment ruling that Heers' conduct rose to the same level as criminal recklessness. See generally In re Cupit, 514 B.R. at 50-51 (distinguishing between criminal negligence and criminal recklessness).

Accordingly, I respectfully dissent. I would reverse the bankruptcy court's summary judgment ruling and would remand for trial on the defalcation/recklessness issue.